SLR:BDM:ABK
F. # 2012V01463

CV 13 - 2077

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

          Plaintiff,

   -against-

TWO MILLION EIGHTY THOUSAND DOLLARS AND
NO CENTS ($2,080,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
MARCH 5, 2013, FORMERLY ON DEPOSIT IN
MORGAN STANLEY SMITH BARNEY ACCOUNT NO.
253-040072 IN THE NAME AND/OR FOR THE
BENEFIT OF STAN TOMCHIN, AND ALL PROCEEDS
TRACEABLE THERETO;

ONE HUNDRED THIRTY THOUSAND SEVEN
HUNDRED FORTY-SIX DOLLARS AND TWENTY-
FIVE CENTS ($130,746.25) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
OCTOBER 24, 2012, FROM THE PREMISES LOCATED
AT 12 AUTUMN LANE, FREEHOLD, NEW JERSEY,
AND ALL PROCEEDS TRACEABLE THERETO;

TEN THOUSAND DOLLARS AND NO CENTS
($10,000.00) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM A 2013 AUDI A6, VIN NO.
WAUGFAFCXDN024374, REGISTERED TO AND IN
THE POSSESSION OF GADOON L. KRYOLLOS,
SITUATED AT OR NEAR THE PREMISES LOCATED
AT 12 AUTUMN LANE, FREEHOLD, NEW JERSEY,
AND ALL PROCEEDS TRACEABLE;

NINETY-ONE THOUSAND ONE HUNDRED SIX
DOLLARS AND SEVENTY-FOUR CENTS ($91,106.74)
IN UNITED STATES CURRENCY, MORE OR LESS,
SEIZED ON OR ABOUT OCTOBER 24, 2012,
FORMERLY ON DEPOSIT IN FREEHOLD SAVINGS
BANK ACCOUNT NO. 0192008021 IN THE NAME
AND/OR FOR THE BENEFIT OF BOM ENTERPRISES,

JURY TRIAL DEMANDED

VERIFIED
COMPLAINT IN REM

Civil Action No.

AMON, CH.J.

NO SUMMONS ISSUED

LLC, AND ALL PROCEEDS TRACEABLE THERETO;

FOUR HUNDRED FIFTY-THREE THOUSAND
SEVENTY-SEVEN DOLLARS AND THREE CENTS
($453,077.03) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT NOVEMBER 20,
2012, FORMERLY ON DEPOSIT AT THE M RESORT
SPA CASINO, LAS VEGAS, NEVADA, IN ACCOUNT
NO. MRH000006734 HELD IN THE NAME AND/OR
FOR THE BENEFIT OF THOMAS LUDFORD, AND
ALL PROCEEDS TRACEABLE THERETO;

FORTY-NINE THOUSAND EIGHT HUNDRED
THIRTY-NINE DOLLARS AND NO CENTS
($49,839.00), IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM THE PREMISES LOCATED AT 6464 TARA
AVENUE, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

CASINO GAMBLING CHIPS VALUED AT
APPROXIMATELY FIFTEEN THOUSAND FOUR
HUNDRED ONE DOLLARS AND NO CENTS
($15,401.00) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM THE PREMISES LOCATED AT 6464 TARA
AVENUE, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

TWO HUNDRED SEVENTY THOUSAND DOLLARS
AND NO CENTS ($270,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
NOVEMBER 20, 2012, FORMERLY ON DEPOSIT IN
ACCOUNT NO. PRH000076575 HELD IN THE NAME
AND/OR FOR THE BENEFIT OF STEVEN DIANO AT
THE PALMS CASINO RESORT IN LAS VEGAS,
NEVADA, AND ALL PROCEEDS TRACEABLE
THERETO);

ONE HUNDRED THOUSAND DOLLARS AND NO
CENTS ($100,000.00) IN UNITED STATES CURRENCY,
MORE OR LESS, SEIZED ON OR ABOUT OCTOBER
25, 2012, FROM SAFE DEPOSIT BOX NO. 1012 HELD
IN THE NAME AND/OR FOR THE BENEFIT OF IAN
MANDELL AT THE FREMONT HOTEL AND CASINO,
LAS VEGAS, NEVADA, AND ALL PROCEEDS

2

TRACEABLE THERETO;

ONE HUNDRED FIFTY THOUSAND DOLLARS AND
NO CENTS ($150,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
OCTOBER 25, 2012, FROM SAFE DEPOSIT BOX NO.
1013 HELD IN THE NAME AND/OR FOR THE
BENEFIT OF IAN MANDELL AND DANIELLE
ZIPPER-MANDELL AT THE FREMONT HOTEL AND
CASINO, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

ONE HUNDRED FIFTY THOUSAND DOLLARS AND
NO CENTS ($150,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
OCTOBER 25, 2012, FROM SAFE DEPOSIT BOX NO.
1041 HELD IN THE NAME AND/OR FOR THE
BENEFIT OF IAN MANDELL AT THE FREMONT
HOTEL AND CASINO, LAS VEGAS, NEVADA, AND
ALL PROCEEDS TRACEABLE THERETO;

WINNING GAMBLING TICKETS VALUED AT
APPROXIMATELY FORTY-NINE THOUSAND THREE
HUNDRED FIFTY DOLLARS AND NO CENTS
($49,350.00) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM THE FREMONT HOTEL AND CASINO, ROOM
609, LAS VEGAS, NEVADA, AND ALL PROCEEDS
TRACEABLE THERETO;

WINNING GAMBLING TICKETS VALUED AT
APPROXIMATELY ONE HUNDRED FIFTY-THREE
THOUSAND TWENTY-FIVE DOLLARS AND NO
CENTS ($153,025.00) IN UNITED STATES CURRENCY,
MORE OR LESS, SEIZED ON OR ABOUT OCTOBER
24, 2012, FROM THE FREMONT HOTEL AND CASINO,
ROOM 609, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

WINNING GAMBLING TICKETS VALUED AT
APPROXIMATELY ONE HUNDRED FORTY-FIVE
THOUSAND THREE HUNDRED EIGHTY-SIX
DOLLARS AND THIRTY-FIVE CENTS ($145,386.35) IN
UNITED STATES CURRENCY, MORE OR LESS,
SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM
THE FREMONT HOTEL AND CASINO, ROOM 609,

3

LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

TWENTY THOUSAND DOLLARS AND NO CENTS ($20,000.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM THE FREMONT HOTEL AND CASINO, ROOM 609, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

THIRTEEN THOUSAND FOUR HUNDRED TEN DOLLARS AND NO CENTS ($13,410.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM THE FREMONT HOTEL AND CASINO, ROOM 609, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

CASINO GAMBLING CHIPS VALUED AT APPROXIMATELY SEVENTY-NINE THOUSAND EIGHT DOLLARS AND NO CENTS ($79,008.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 25, 2012, FROM SAFE DEPOSIT BOX NO. 3061 HELD IN THE NAME AND/OR FOR THE BENEFIT OF PAUL SEXTON AND KEITH SEXTON AT THE BELLAGIO HOTEL AND CASINO, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

SEVENTY-FOUR THOUSAND NINE HUNDRED SIXTY-SIX DOLLARS AND NO CENTS ($74,966.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 25, 2012, FROM SAFE DEPOSIT BOX NO. 3061 HELD IN THE NAME AND/OR FOR THE BENEFIT OF PAUL SEXTON AND KEITH SEXTON AT THE BELLAGIO HOTEL AND CASINO, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

WINNING CASINO GAMBLING TICKETS VALUED AT APPROXIMATELY SEVEN HUNDRED FORTY-ONE THOUSAND THREE HUNDRED NINETY-SEVEN DOLLARS AND TWENTY-FIVE CENTS ($741,397.25) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 31, 2012, FROM SAFE DEPOSIT BOX NO. 3061 HELD IN THE NAME

4

AND/OR FOR THE BENEFIT OF PAUL SEXTON AND KEITH SEXTON AT THE BELLAGIO HOTEL AND CASINO, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

WINNING CASINO GAMBLING TICKETS VALUED AT APPROXIMATELY THIRTY-FOUR THOUSAND SEVEN HUNDRED FORTY-FIVE DOLLARS AND FORTY-FIVE CENTS ($34,745.45) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 31, 2012, FROM SAFE DEPOSIT BOX NO. 3061 HELD IN THE NAME AND/OR FOR THE BENEFIT OF PAUL SEXTON AND KEITH SEXTON AT THE BELLAGIO HOTEL AND CASINO, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

WINNING CASINO GAMBLING TICKETS VALUED AT APPROXIMATELY SEVENTY-THREE THOUSAND FIVE HUNDRED DOLLARS AND NO CENTS ($73,500.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 31, 2012, FROM SAFE DEPOSIT BOX NO. 3061 HELD IN THE NAME AND/OR FOR THE BENEFIT OF PAUL SEXTON AND KEITH SEXTON, AT THE BELLAGIO HOTEL AND CASINO, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

TWO HUNDRED SIXTY-SIX THOUSAND THREE HUNDRED TWENTY-NINE DOLLARS AND NO CENTS ($266,329.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM THE PREMISES LOCATED AT 5415 W. HARMON AVENUE, UNIT 1170, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

CASINO GAMBLING CHIPS VALUED AT APPROXIMATELY ONE HUNDRED EIGHTY-SIX THOUSAND DOLLARS AND NO CENTS ($186,000.00) IN UNITED STATES CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM THE PREMISES LOCATED AT 5415 W. HARMON AVENUE, UNIT 1170, LAS VEGAS, NEVADA, AND ALL PROCEEDS TRACEABLE THERETO;

5

MONEY ORDERS VALUED AT APPROXIMATELY
SEVENTEEN THOUSAND THREE HUNDRED
DOLLARS AND NO CENTS ($17,300.00) IN UNITED
STATES CURRENCY, MORE OR LESS, SEIZED ON OR
ABOUT OCTOBER 24, 2012, FROM THE PREMISES
LOCATED AT 5415 W. HARMON AVENUE, UNIT
1170, LAS VEGAS, NEVADA, AND ALL PROCEEDS
TRACEABLE THERETO;

EIGHT HUNDRED EIGHTY-NINE THOUSAND SIX
HUNDRED SEVENTY-TWO DOLLARS AND NO
CENTS ($889,672.00) IN UNITED STATES CURRENCY,
MORE OR LESS, SEIZED ON OR ABOUT OCTOBER
24, 2012, FROM THE PREMISES LOCATED AT 2817
HIGH SAIL COURT, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

CASINO GAMBLING CHIPS VALUED AT
APPROXIMATELY ONE HUNDRED FORTY-FIVE
THOUSAND THREE HUNDRED NINETY-SIX
DOLLARS AND NO CENTS ($145,396.00) IN UNITED
STATES CURRENCY, MORE OR LESS, SEIZED ON OR
ABOUT OCTOBER 24, 2012, FROM THE PREMISES
LOCATED AT 2817 HIGH SAIL COURT, LAS VEGAS,
NEVADA, AND ALL PROCEEDS TRACEABLE
THERETO; and

CASINO GAMBLING CHIPS VALUED AT
APPROXIMATELY SEVEN THOUSAND TWENTY-
FIVE DOLLARS AND NO CENTS ($7,025.00) IN
UNITED STATES CURRENCY, MORE OR LESS,
SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM
THE PREMISES LOCATED AT 2817 HIGH SAIL
COURT, LAS VEGAS, NEVADA, AND ALL PROCEEDS
TRACEABLE THERETO,

Defendants *In Rem.*

Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH,

United States Attorney for the Eastern District of New York, Ameet B. Kabrawala, Assistant

United States Attorney, of counsel, for its verified complaint *in rem*, hereby alleges, upon

information and belief, as follows.

6

## NATURE OF THE CASE

1.      Plaintiff, United States of America ("Plaintiff" or the "United States"),

brings this *in rem* civil forfeiture action to forfeit and condemn to the exclusive use and benefit

of the United States the above-captioned defendants *in rem*. Such defendants *in rem*: (a)

represent properties which constitute or are derived from proceeds traceable to violations of 18

U.S.C. §§ 1084, 1952 and 1955, and are therefore subject to forfeiture under 18 U.S.C. §

981(a)(1)(C); (b) represent properties involved in transactions or attempted transactions in

violation of 18 U.S.C. §§ 1956 and 1957, and are therefore subject to forfeiture under 18 U.S.C.

§ 981(a)(1)(A); and/or (c) represent properties used in violation of 18 U.S.C. § 1955(a), and are

therefore subject to forfeiture under 18 U.S.C. § 1955(d).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345

and 1355.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 in

that the acts and omissions giving rise to forfeiture occurred within the Eastern District of New

York.

## THE DEFENDANTS *IN REM*

4.      Defendants *in rem* consist of the following (hereinafter collectively, the

"Defendant Assets"):

a.      Two million eighty thousand dollars and no cents ($2,080,000.00)

in United States currency, more or less, seized on or about March 5, 2013, formerly on deposit in

7

Morgan Stanley Smith Barney account no. 253-040072 in the name and/or for the benefit of Stan Tomchin, and all proceeds traceable thereto (hereinafter, "Tomchin $2,080,000");[1]

        b.     One hundred thirty thousand seven hundred forty-six dollars and twenty-five cents ($130,746.25) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 12 Autumn Lane, Freehold, New Jersey, and all proceeds traceable thereto (hereinafter, "Kyrollos $130,746.25");

        c.     Ten thousand dollars and no cents ($10,000.00) in United States currency, more or less, seized on or about October 24, 2012, from a 2013 Audi A6, VIN No. WAUGFAFCXDN024374, registered to and in the possession of Gadoon L. Kryollos, situated at or near the premises located at 12 Autumn Lane, Freehold, New Jersey, and all proceeds traceable thereto (hereinafter, "Kyrollos $10,000");

        d.     Ninety-one thousand one hundred six dollars and seventy-four cents ($91,106.74) in United States currency, more or less, seized on or about October 24, 2012, formerly on deposit in Freehold Savings Bank account no. 0192008021 in the name and/or for the benefit of BOM Enterprises, LLC, and all proceeds traceable thereto (hereinafter, "Kyrollos-BOM $91,106.74");

        e.     Four hundred and fifty-three thousand seventy-seven dollars and three cents ($453,077.03) in United States currency, more or less, seized on or about November 20, 2012, formerly on deposit at the M Resort Spa Casino, Las Vegas, Nevada, in account no. MRH000006734 held in the name and/or for the benefit of Thomas Ludford, and all proceeds traceable thereto (hereinafter, "Ludford $453,077.03");

---

[1] The United States has designated these assets by the name of the person from whom they were seized and/or individuals that are thought to have a potential claim to the assets. Such persons are described in detail below.

8

f.    Forty-nine thousand eight hundred thirty-nine dollars and no cents ($49,839.00), in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 6464 Tara Avenue, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $49,839");

g.    Casino gambling chips valued at approximately fifteen thousand four hundred one dollars and no cents ($15,401.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 6464 Tara Avenue, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $15,401");

h.    Two hundred seventy thousand dollars and no cents ($270,000.00) in United States currency, more or less, seized on or about November 20, 2012, formerly on deposit in account no. PRH000076575 held in the name and/or for the benefit of Steven Diano at the Palms Casino Resort in Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $270,000");

i.    One hundred thousand dollars and no cents ($100,000.00) in United States currency, more or less, seized on or about October 25, 2012, from safe deposit box no. 1012 held in the name and/or for the benefit of Ian Mandell at the Fremont Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $100,000");

j.    One hundred fifty thousand dollars and no cents ($150,000.00) in United States currency, more or less, seized on or about October 25, 2012, from safe deposit box no. 1013 held in the name and/or for the benefit of Ian Mandell and Danielle Zipper-Mandell at the Fremont Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter "Mandell-Zipper $150,000");

9

k.      One hundred fifty thousand dollars and no cents ($150,000.00) in United States currency, more or less, seized on or about October 25, 2012, from safe deposit box no. 1041 held in the name and/or for the benefit of Ian Mandell at the Fremont Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter "Mandell $150,000");

l.      Winning gambling tickets valued at approximately forty-nine thousand three hundred fifty dollars and no cents ($49,350.00) in United States currency, more or less, seized on or about October 24, 2012, from the Fremont Hotel and Casino, room 609, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $49,350");

m.      Winning gambling tickets valued at approximately one hundred fifty-three thousand twenty-five dollars and no cents ($153,025.00) in United States currency, more or less, seized on or about October 24, 2012, from the Fremont Hotel and Casino, room 609, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $153,025");

n.      Winning gambling tickets valued at approximately one hundred forty-five thousand three hundred and eighty-six dollars and thirty-five cents ($145,386.35) in United States currency, more or less, seized on or about October 24, 2012, from the Fremont Hotel and Casino, room 609, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $145,386.35");

o.      Twenty thousand dollars and no cents ($20,000.00) in United States currency, more or less, seized on or about October 24, 2012, from the Fremont Hotel and Casino, room 609, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $20,000");

p.      Thirteen thousand four hundred ten dollars and no cents ($13,410.00) in United States currency, more or less, seized on or about October 24, 2012, from

10

the Fremont Hotel and Casino, room 609, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Mandell $13,410");

q. Casino gambling chips valued at approximately seventy-nine thousand eight dollars and no cents ($79,008.00) in United States currency, more or less, seized on or about October 25, 2012, from safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton at the Bellagio Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Sexton $79,008");

r. Seventy-four thousand nine hundred sixty-six dollars and no cents ($74,966.00) in United States currency, more or less, seized on or about October 25, 2012, from safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton at the Bellagio Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Sexton $74,966");

s. Winning casino gambling tickets valued at approximately seven hundred forty-one thousand three hundred ninety-seven dollars and twenty-five cents ($741,397.25) in United States currency, more or less, seized on or about October 31, 2012, from safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton at the Bellagio Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Sexton $741,397.25");

t. Winning casino gambling tickets valued at approximately thirty-four thousand seven hundred forty-five dollars and forty-five cents ($34,745.45) in United States currency, more or less, seized on or about October 31, 2012, from safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton at the Bellagio Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Sexton 34,745.45");

11

u.      Winning casino gambling tickets valued at approximately seventy-three thousand five hundred dollars and no cents ($73,500.00) in United States currency, more or less, seized on or about October 31, 2012, from safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton, at the Bellagio Hotel and Casino, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Sexton $73,500");

v.      Two hundred and sixty-six thousand three hundred twenty-nine dollars and no cents ($266,329.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $266,329");

w.      Casino gambling chips valued at approximately one hundred eighty-six thousand dollars and no cents ($186,000.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $186,000");

x.      Money orders valued at approximately seventeen thousand three hundred dollars and no cents ($17,300.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $17,300");

y.      Eight hundred eighty-nine thousand six hundred seventy-two dollars and no cents ($889,672.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 2817 High Sail Court, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "England $889,672");

12

z.      Casino gambling chips valued at approximately one hundred forty-five thousand three hundred ninety-six dollars and no cents ($145,396.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 2817 High Sail Court, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "England $145,396"); and

aa.     Casino gambling chips valued at approximately seven thousand twenty-five dollars and no cents ($7,025.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 2817 High Sail Court, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "England $7,025").

## STATUTORY FRAMEWORK

5.      Pursuant to 18 U.S.C. § 1084(a), it is unlawful to knowingly use a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placement of bets or wagers on any sporting event or contest while engaged in the business of betting or wagering.  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1084(a) is subject to forfeiture to the United States.

6.      Pursuant to 18 U.S.C. § 1952(a)(1), it is unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a).  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952(a)(1) is subject to forfeiture to the United States.

7.    Pursuant to 18 U.S.C. § 1952(a)(3), it is unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a).  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952(a)(3) is subject to forfeiture to the United States.

8.    Pursuant to 18 U.S.C. § 1955(a), "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined . . . or imprisoned not more than five years, or both."  Pursuant to 18 U.S.C. § 1955(b)(1), the term "illegal gambling business" is defined for purposes of Section 1955 as a gambling business which "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."  Pursuant to 18 U.S.C. § 1955(d), "[a]ny property, including money, used in violation of the provisions of [Section 1955] may be seized and forfeited to the United States."  Moreover, pursuant to 18 U.S.C. § 981(a)(1)(C), "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity' [as defined in 18 U.S.C. § 1956(c)(7), and which includes violations of 18 U.S.C. § 1955], or a conspiracy to commit such offense" is subject to forfeiture to the United States.

9.    In turn, under the New York Penal Law ("NYPL") § 225.10(1), a person is guilty of "promoting gambling" in the first degree "when he knowingly advances or profits from

14

unlawful gambling activity by: [e]ngaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars . . . ."

10. Further, under the NYPL § 225.00(4), a person "'advances gambling activity' when, acting as other than a player, he engages in conduct which materially aids any form of gambling activity." NYPL § 225.00(4) identifies various types of conduct which may constitute gambling activity, including conduct "toward the arrangement of any of its financial or recording phases," and concludes with the catch-all phrase referring to conduct directed "toward any other phase of [a gambling] operation."

11. Pursuant to 18 U.S.C. § 1956(a)(2)(A), it is unlawful to transport, transmit or transfer, or attempt to transport, transmit or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a). In turn, pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to forfeiture to the United States.

12. Pursuant to 18 U.S.C. § 1957, it is unlawful to conduct a monetary transaction in criminally derived property in an amount greater than $10,000. Under 18 U.S.C. § 1957(f)(1), a monetary transaction is defined as a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ." In turn, pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property, is subject to forfeiture to the United States.

## GENERAL BACKGROUND ON ILLEGAL GAMBLING ORGANIZATIONS

13.     Generally, an illegal gambling enterprise has an ascertainable hierarchical structure, a continuity of existence, and a criminal purpose beyond the scope of the individual acts of accepting wagers. Illegal gambling enterprises are comprised of a group of persons sharing the common purpose of engaging in, and profiting from, the unlawful advancement of gambling.

14.     Master agents are at the top of the hierarchical structure and are those within the organization who oversee a group of bookmakers, agents, banks, and money collectors, and under whose accounts the agents take bets from the wagering public. Master agents have authority to make certain managerial decisions and to extract a share of the agent's income from illegal wagering.

15.     Illegal gambling enterprises also employ "agents" whose job it is to build a clientele of bettors who will regularly bet with the enterprise. Agents become the intermediary between the bettor and the enterprise itself, and it is the agent's job to "settle-up" usually on a designated day each week by collecting and paying out money owed. There are generally two ways an agent operates: he either places bets with the wire room for his bettors or the bettors call in the bets by identifying themselves to the agents by pre-arranged codes. The agent is generally compensated by taking a percentage of his customers' losses.

16.     Bookmakers are those that direct the day-to-day operation of the illegal gambling enterprise. They take bets, calculate odds, and pay out winnings.

17.     A wire room is a location through which bets are taken over the phone or via the Internet by clerks; it serves as a clearing house for collecting, dispensing, and accounting for money won and lost on sports bets and a place where records of gambling accounts for

16

bookmakers and their associates are housed. A head clerk supervises clerks and deals directly with the bookmaker; clerks answer telephone calls at the wire room and record bets called in by bettors. An accountant maintains the financial records of the operation. Together, the head clerk and accountant ensure that the gambling activity or "figures," are reconciled for the bookmaker.

18.     Many bookmaking operations have taken advantage of toll-free numbers and the Internet. In this scenario, the bookmaker operates his enterprise locally while a wire room is located offshore, such as in Costa Rica where gambling has been legalized. Bettors can log onto an Internet website or call toll-free numbers to place bets to the offshore wire room directly, and not through the agent who is located in the United States. In this case, the agent will regulate the online gambling site without taking bets directly from bettors.

19.     Illegal gambling enterprises also employ "money collectors," "money distributors," and "banks" to handle the flow of money between the participants of the enterprise. They are responsible for the collection and distribution of illegal gambling proceeds between the bookmaker and the agents and/or master/super agents. "Banks" are responsible for holding large amounts of money for the operation and may be persons and entities. This process of the collection, distribution and holding of large amounts of cash is necessary because federal law prohibits the use of wire transfers and credit cards in paying and collecting gambling debts. Additionally, bettors usually prefer that their winnings are paid in cash to avoid paying taxes and having a written record created of their illegal winnings.

## THE INVESTIGATION

20.     From in or around February 2011 through in or around October 2012, members of the Organized Crime Investigation Division ("OCID") of the New York City Police Department ("NYPD"), and the Queens County District Attorney's Office conducted a joint

17

investigation (the "Investigation") into an illegal Internet gambling and messenger betting organization located in Queens County, New York and elsewhere, including in New Jersey, Pennsylvania, Nevada, and California (the "Organization").

21. The Organization combined conventional bookmaking, messenger betting, and an unlawful Internet gambling network. The Organization operated, *inter alia*, through the websites "www.pinnaclesports.com," "www.Jazzsports.net," "www.wager4you.com," "www.playhera.ag," and through various casinos in Las Vegas, Nevada.

22. The Organization, which was devoted exclusively to illegal gambling, operated using the aforementioned websites, among others. Proceeds of the gambling operation were transferred in several ways, including through safe deposit boxes, casino accounts located in Las Vegas, Nevada, wire transfers via domestic and foreign bank accounts, and by hand-to-hand exchanges of United States currency and casino gambling chips between members of the Organization.

23. Members of the Organization included "bookmakers," "master agents," "agents," "banks," and "money collectors," among others. Through their various roles, members of the Organization facilitated illegal gambling and money laundering activities of the Organization.

24. As a result of the Investigation, approximately 25 participants in the Organization have been charged as defendants in Indictment No. 2593/2012 (the "Indictment") filed on or about October 19, 2012 in the Criminal Term of the Supreme Court of the State of New York, Queens County. The Indictment charges, *inter alia*, numerous gambling-related crimes, including various degrees of promoting gambling, money laundering, criminal conspiracy, and enterprise corruption.

25.     The following individuals, among others, are charged in the Indictment: Stanley Tomchin, Gadoon Kyrollos, Steven Diano, Ian Mandell, Paul Sexton, Jerald Branca, and Brandt England.  These individuals, and others, were arrested on or about October 24, 2012.

## THE DEFENDANT ASSETS

### Stanley Tomchin

26.     Stanley Tomchin is a partner of Pinnacle Sports ("Pinnacle"), which maintains a website at www.pinnaclesports.com.  Pinnacle Sports is an online gambling website based in the Country of Curaçao, in the now-dissolved Netherlands Antilles.  Tomchin has been charged as a defendant in the Indictment.

27.     Although Pinnacle Sports and similar gambling websites are based offshore, they serve players based in the United States.  Such gambling websites, including Pinnacle, offer "real money" casino games and sports betting to players in the United States, in violation of multiple federal criminal statutes, including but not limited to, 18 U.S.C. § 1084 (making it unlawful to use a wire in connection with placing a bet or wager), § 1955 (making it illegal to operate an illegal gambling business), and § 1956 (money laundering).

28.     Pinnacle Sports is used by the Organization to serve bettors in the United States and acts as a "bank" for the Organization.

29.     For example, during a lawfully intercepted and monitored telephone call on or about June 4, 2012, Stanley Tomchin was recorded discussing with an unknown male how accounting works for Pinnacle and how much cash Pinnacle has on hand.  Tomchin stated, in sum and substance, that "we have 51 in cash plus we have 15 that's owed to us from George."  The term "51" refers to $51 million and "15" refers to $15 million that was owed by George Molsbarger, a co-defendant charged in the Indictment who is also an owner of Pinnacle.

19

30.     Additionally, during the Investigation, the NYPD used a confidential informant ("CI") who provided reliable and corroborated information in connection with the Investigation. At the direction of the NYPD, the CI used www.pinnaclesports.com to place bets for individuals in the United States.

31.     The Investigation further revealed that Tomchin directed the transfer of gambling proceeds from Pinnacle's accounts to other accounts controlled by Tomchin and his co-defendants in the United States, who would then withdraw large sums of cash, often exceeding $100,000, to pay out money owed to betters, bookmakers, and other persons in the United States. For example, during a lawfully intercepted and monitored telephone call on or about June 5, 2012, Tomchin was recorded arranging for the delivery of $200,000 in cash to his sister, J. Tomchin, in New York, in furtherance of the illegal gambling Organization.

32.     Later that month, on or about June 21, 2012, Stanley Tomchin called the Pinnacle Sports and directed a wire room clerk to credit the Pinnacle account of a co-defendant, Brandt England, $350,000 because England had that amount delivered in cash to Tomchin's sister in New York. Later that day, Stanley Tomchin was recorded asking his sister, in sum and substance, whether she received "three fifty worth of grapes[,]" to which his sister responded, in sum and substance, "yes." Stanley Tomchin used code, calling the cash "grapes" in an attempt to thwart any eavesdropping by law enforcement officials.

33.     Tomchin engaged in other similar calls and transactions, which reflect that he transferred large sums of money from Pinnacle to co-defendants and bettors in the United States in furtherance of the illegal gambling Organization.

34.     For example, on or about May 8, 2012, the NYPD intercepted a telephone call between two of Tomchin's co-defendants, Brandt England and Kelly Barsel, whom the

Investigation revealed were bookmakers in the Organization. England and Barsel discussed the seizure of approximately $1,500,000 in United States currency by law enforcement officials from a money collector for the Organization and how the seizure would impact their ability to distribute gambling proceeds to bettors based in the United States. In the call, England said, in sum and substance, "we got customers we need to pay this week and . . . no real way to pay em . . . . I need the money for a couple weeks until I can get reimbursed from Pinnacle . . . ." Later that day, on or about May 8, 2012, England explained to Barsel, in sum and substance, "I owe $1 million. We owe close to 5. Don't worry Pinnacle is good for it." During that conversation, England reassured Barsel, in sum and substance, that "Pinnacle thinks they'll get it [the seized $1,500,000] back."

35.     The next day, May 9, 2012, England and Barsel continued to discuss the seizure of $1,500,000 by law enforcement officials. In a lawfully intercepted and monitored telephone call from that day, Barsel asked England, in sum and substance, "Pinnacle stands by it right? What if this money [the seized $1.5 million] goes missing?" In the foregoing calls from May 8-9, 2012, Barsel and England confirmed that Pinnacle Sports acted as a bank or financial backer by providing money to members of the Organization in the United States in furtherance of their illegal gambling enterprise.

36.     Similar monitored conversations demonstrate that Pinnacle had long been involved in and supported the Organization. For example, on or about July 19, 2011, Gadoon Kyrollos, another co-defendant charged in the Indictment, told Brandt England, in sum and substance, that "I need some green[.] [A]re you going to give me Pinnacle money?" England responded, in sum and substance, "Yes my [Pinnacle] account is LU 500[.] Skype me with your Pinnacle number[.]" England then said, in sum and substance, "[w]e can give you 250"

signifying $250,000, to which Kyrollos said, in sum and substance, "Ok." In this call, Kyrollos, who operated in New Jersey, requested that England wire transfer $250,000 of gambling proceeds supplied by Pinnacle Sports for use by, and in furtherance of, the Organization. Similarly, earlier that day, on or about July 19, 2011, Kyrollos called an individual known as "Art" to perform a wire transfer from Pinnacle for $100,000 to "clean it in New York."

37.     Stanley Tomchin maintains several accounts at Morgan Stanley Smith Barney ("MSSB"), including account no. 253-040072 in the name and/or for the benefit of Stanley Tomchin (hereinafter, the "Tomchin MSSB Account").

38.     The Tomchin MSSB Account received numerous wire transfers from an account held by the Toronto Dominion Bank in Canada ("TD Bank") which, in turn, received a large wire transfer from a bank located in Curaçao, where Pinnacle Sports is based.

39.     Specifically, on or about December 13, 2011, Tomchin's TD Bank account, account no. 7152841 (hereinafter, the "TD Bank Account"), received a wire transfer in the amount of $4,385,965.00 from "Cevuha N.V." located at the street address of "Pater Ewwensweg 31 (Second Floor), Willemstad, Curaçao, Netherlands Antilles." According to Pinnacle's website, Pinnacle's "Head Office" is located at "Pater Euwensweg 31" in Willemstad, Curaçao.

40.     An Internet search reveals that "Cevuha N.V." is related to Pinnacle Sports in that "Cevuha N.V." is the alias of Pinnacle Sports on the Internet-based wire transfer service WebMoney Transfer, accessible at www.wmtransfer.com. According to WebMoney Transfer's website, Cevuha N.V. has a WebMoney identification number of "WMID828245830532" belonging to "Pinnacle Sports Worldwide." Further, WebMoney Transfer's webpage for Cevuha N.V. lists the following email address under the "contact"

information section: csd@pinnaclesports.com. This is the same "contact" email listed on Pinnacle's website.

41.     Following Pinnacle's transfer of $4,385,965.00 to Tomchin's TD Bank Account, there were approximately six wire transfers from the TD Bank Account to the Tomchin MSSB Account, totaling $2,080,000.00.

42.     On or about October 23, 2012 and January 14, 2013, United States Magistrate Judge Robert M. Levy of the United States District Court for the Eastern District of New York issued, upon the application of the United States, warrants authorizing the seizure of the Tomchin MSSB account up to and including the sum of $2,080,000.00, and all proceeds traceable thereto.

43.     Thereafter, the United States and Stanley Tomchin agreed, pursuant to a Stipulation and Order endorsed by the Court on or about February 27, 2013, to substitute cash funds totaling $2,080,000.00 in lieu of the funds held in the Tomchin MSSB Account (Tomchin $2,080,000). Pursuant to said Stipulation and Order, such funds were transferred to the United States Marshals Service on or about March 5, 2013.

### Gadoon Kyrollos

44.     Based on the Investigation, law enforcement agents learned that Kyrollos was a bookmaker and agent in the illegal gambling Organization.

45.     For instance, on or about September 10, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and a man identified only as "Peter." "Peter" stated, in sum and substance, "I need a favor from you[.] Robbie needs money in Cris and Pinnacle[.] I got all this money in New York[.] [W]ould you make the transfer[?] I want to give you money in New York, I need Pinnacle money[.]" In this call, "Peter" was

referring to two offshore gambling websites, "Chris" and "Pinnacle." The website referred to as
"Chris" is accessible at www.betchris.com; "Pinnacle" refers to www.pinnaclesports.com. In
this call, Kyrollos agreed to assist "Peter" by accepting his gambling cash proceeds and
arranging for credits on the web sites for Peter's associate, "Robbie."

46.     On or about October 1, 2012, the NYPD lawfully intercepted and
monitored a telephone call between Kyrollos and Michael Duong, another bookmaker in the
Organization and a defendant charged in the Indictment. During the call, Kyrollos asked Duong,
in sum and substance, "when you are going to run balances[?]" Duong told Kyrollos, in sum and
substance, that they need "a few minutes" to get "figures" and "balances." Kyrollos then said, in
sum and substance, "we have to make sure we are on top of . . . those figures." "Figure" is a
term commonly used by bookmakers to refer to gambling account balance, that is, the monies
owed as a result of illegal gambling. This conversation demonstrates a partnership between
Kyrollos and Duong based on illegal gambling activity.

### A. Kyrollos $130,746.25 and Kyrollos $10,000

47.     Based, *inter alia*, on the above-described evidence of Kyrollos'
involvement in the Organization, on or about October 23, 2012, a magistrate judge in the United
States District Court for the District of New Jersey issued a warrant authorizing the search of,
among other places, Kyrollos' residence, the premises located at 12 Autumn Lane, Freehold,
New Jersey.

48.     On or about October 24, 2012, law enforcement agents lawfully searched
Kyrollos' residence. During the search, Kyrollos advised law enforcement agents of two
locations within his residence where he stored large amounts of currency and stated, in sum and
substance, that there were no other places in which he stored cash. However, during the search,

24

law enforcement agents recovered large amounts of currency in locations other than those Kyrollos had indicated. Law enforcement agents recovered and seized a total of $130,746.25 in United States currency, more or less, from Kyrollos's residence pursuant to the warrant (Kyrollos $130,746.25) and $10,000 in United States currency, more or less, from his vehicle (Kyrollos $10,000). Agents also recovered evidence of illegal gambling activity during the search of Kyrollos's residence, including casino betting slips, gambling and betting records, documents related to gambling, notes on sports players, a parlay card, books on sports betting, gambling tables, and a slot machine.

**B. Kyrollos-BOM $91,106.74**

49.    In or around September 2011, Kyrollos opened an account, number 0192007920 (the "predecessor account"), held in the name of BOM Enterprises, LLC ("BOM") at Freehold Savings Bank in Freehold, New Jersey. This account was subsequently closed by Kyrollos on or about July 27, 2012 following a July 11, 2012 transfer of over $91,000 which Kyrollos claimed to the bank was a theft as a result of a forged check.

50.    On or about July 27, 2012, Kyrollos opened account number 0192008021 in the name of BOM at Freehold Savings Bank (the "BOM Account") in Freehold, New Jersey. The balance of the predecessor account was transferred to the BOM Account on or about July 27, 2012.

51.    BOM was incorporated in the State of New Jersey on or about March 23, 2010. The incorporating documents reflect that BOM's business purpose was "Technology Consulting and Services."

52.    Based on evidence obtained during the Investigation, law enforcement officials learned that BOM's sole purpose was to promote the illegal gambling operation of the

Organization. The BOM Account was used to launder the illegal proceeds of that gambling business.

53.     Specifically, a review of bank records and surveillance indicated that the BOM Account was used to accept overseas wire transfers from companies identified in the Investigation, based in the Cayman Islands and in Hong Kong.

54.     Lawfully intercepted telephone conversations corroborated deposits and showed a pattern of bets being placed alongside corresponding deposits. After the overseas transfers were made into the BOM Account, Kyrollos made payments in the name of "BOM Enterprises Payroll," through which he would pay himself and his co-defendants in the Organization, among others. The Investigation revealed that all but two deposits into the BOM Account resulted from overseas wires; both of these deposits were from Kyrollos' co-conspirators.

55.     Records for the BOM Account indicate that Kyrollos paid himself a salary from the BOM Account. For example, at least three checks were drawn on the BOM Account and made payable to Kyrollos, and each of these checks list "Salary" in the memo line. The first was dated November 2, 2011 and was in the amount of $17,551.75, the second was dated November 30, 2011 and was in the amount of $21,277.75, and the third was dated December 28, 2011 and was in the amount of $25,337.00. Similar transfers were made in or around August 2012.

56.     Furthermore, email lawfully intercepted during the Investigation revealed that Kyrollos instructed agents in the Organization to remit payment of gambling proceeds to BOM via wire transfers. For example, on or about March 19, 2012, an email message was sent from Kyrollos's email address, virtusprosports@hotmail.com, to a bookmaker in Costa Rica.

26

The email stated, in sum and substance, "Please wire 48695 to our account at Freehold Savings Bank. Unfortunately I do not have the wire information at this time because we changed email addresses. You may have that info in a previous email. Let me know if you cannot retrieve the bank wire into [sic]. Thanks, Sincerely Spanky's Office." The number 48695 represented $48,695. Further, this email demonstrated that Kyrollos, a/k/a Spanky, directed others involved in the illegal gambling Organization to wire payments into Freehold Saving Bank, where the BOM Account was held.

57.     Based, *inter alia*, on the above, on October 23, 2012, United States Magistrate Judge Robert M. Levy issued a warrant authorizing the seizure of all funds on deposit in the BOM Account and all proceeds traceable thereto. The warrant was executed by law enforcement agents on or about October 24, 2012 and resulted in the seizure of approximately $91,106.74 in United States currency.

### Thomas Ludford

58.     On or about February 6, 2012, Kyrollos met with Michael Colbert, who is another defendant charged in the Indictment and a member of the Organization, at the M Resort Spa Casino in Las Vegas, Nevada (the "M Resort"). They discussed, among other things, the need to recruit persons to operate nominee accounts at various Las Vegas casinos for the use and benefit of Kyrollos and other members of the Organization. A nominee account is an account in which the named holder holds the assets in it on behalf of another.

59.     Beginning in or around July 2012, numerous lawfully intercepted telephone calls revealed that Kyrollos attempted to recruit bettors to make wagers for him at a sports book located within the M Resort in Las Vegas. During this time period, Kyrollos spoke with Thomas Ludford, among others, in an attempt to convince Ludford to work for Kyrollos.

60.     Account number MRH000006734 at the M Resort in Las Vegas was held in the name and/or for the benefit of Thomas Ludford (hereinafter, the "Ludford Account").

61.     On or about September 5, 2012, the NYPD lawfully intercepted and monitored a telephone call between Ludford and Kyrollos. During the call, Ludford told Kyrollos that Ludford could bet up to ten thousand dollars per game on Kyrollos' behalf.

62.     On or about September 6, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Ludford. In the call, Kyrollos called Ludford to tell Ludford, in sum and substance, that he "[f]ucked up" the placement of a wager and that is was a big mistake. Ludford asked, in sum and substance, what the error was, and Kyrollos explained that all calls to the wire room are taped. Kyrollos then played back the relevant call for Ludford in which Ludford was supposed to place a wager for "383 / + 8 ½" but instead placed a wager for "383 / - 8 ½." Kyrollos then asked Ludford, in sum and substance, how Ludford would correct the mistake, to which Ludford replied, in sum and substance, to deduct it from Ludford's pay. Kyrollos told Ludford, in sum and substance, that they can "make a lot of money doing this. I want to see you get paid, I don't want to take money out of your pocket." Kyrollos then told Ludford, in sum and substance, to consider it an early "Christmas bonus" and Ludford said, in sum and substance, that it would never happen again. This call demonstrates that Ludford conducted illegal gambling on Kyrollos' behalf in furtherance of the Organization, and was paid for doing so.

63.     On or about September 19, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Ludford. During the call, Kyrollos told Ludford, in sum and substance, that he needed Ludford to "pick up some money because we're running a little low." Kyrollos then gave Ludford instructions, telling him, in sum and

28

substance, to call "715-8364. Guy's name is Grey . . . . Pick up 62,500 . . . you stick that in the account. Make him come to you if you can . . . . Meet in the lobby or something . . . ." In this call, Kyrollos gave Ludford instructions on where to pick up money intended for the Ludford Account and to deposit the same into that account. Casino records for the Ludford Account confirmed that approximately $60,000 in United States currency was deposited into the Ludford Account later that day.

64. On or about September 23, 2012, the NYPD lawfully intercepted and monitored a telephone call between Ludford and Kyrollos. During the call, Ludford asked Kyrollos, in sum and substance, to confirm whether "we [are] going to be done like we always are, you know, at 5:30 [p.m.] when the game goes off." Kyrollos then told Ludford, in sum and substance, "Yeah, that's fine." Later in the call, Kyrollos said, in sum and substance, "You winning or losing in that account means nothing to be honest. You could lose a million and we'll still have a good week . . . so it doesn't really matter. We just need the numbers to fall and that's it so the Jets four and three that was big for us." In this call, Kyrollos confirmed his role as the actual account holder for the Ludford Account and alluded to the larger scope of the illegal gambling Organization.

65. Between February 2012 and October 2012, over $800,000.00 was deposited into the Ludford Account.

66. Based, *inter alia*, on the above, on November 19, 2012, United States Magistrate Judge Cheryl L. Pollak of the United States District Court for the Eastern District of New York issued a warrant authorizing the seizure of all funds on deposit in the Ludford Account and all proceeds traceable. The warrant was executed by law enforcement agents on or

29

about November 20, 2012 and resulted in the seizure of approximately $453,077.03 in United States currency.

### Steven Diano

67.     Based on the Investigation, law enforcement officials learned that Steven Diano was a bookmaker involved in the illegal gambling Organization, as he routinely took wagers, instructed others to place wagers at various Las Vegas casinos, and paid for and collected money used in illegal gambling.

68.     For example, on or about November 28, 2011, the NYPD lawfully intercepted and monitored a telephone call between Diano and another individual, K. Gillman, in which Diano instructed this individual to meet someone at the north valet of the Bellagio Hotel and Casino (the "Bellagio") in Las Vegas, Nevada.

69.     Minutes after this call, on or about November 28, 2011, the NYPD lawfully intercepted and monitored a telephone call between Diano and his step-son, Joseph Patterson. In the call, Diano told Patteron, in some and substance, to put together "one hundred fifty" in cash, to which Patterson responded, in sum and substance, "one hundred fifty thousand, ok[.]"

70.     Thereafter, on or about November 28, 2011, law enforcement agents observed Patterson, who was in the Race and Sports Book at the Bellagio, walk to the north valet. When Patterson arrived at the north valet, Gilman exited a dark-colored vehicle and waved to Patterson. Patterson approached Gilman and handed Gilman bundles of cash. The foregoing calls, coupled with the observation, demonstrate that Diano coordinated the delivery of illegal gambling proceeds.

30

71.     On or about February 6, 2012, law enforcement agents observed Diano meet with Kyrollos and Michael Duong at a restaurant in Las Vegas, Nevada. Lawfully intercepted and monitored telephone calls reveal that Diano and Kyrollos are both members of the Organization.

72.     For example, on or about March 14, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Ian Mandell, an agent in the Organization and a defendant charged in the Indictment. Diano asked Mandell, in sum and substance, whether Mandell needed "thirty" meaning $30,000, and told Mandell to pick it up at the Bellagio. Diano instructed Mandell to meet at the north valet of the Bellagio. Later that day, the NYPD lawfully intercepted and monitored another telephone call between Diano and Mandell during which Mandell told Diano, in sum and substance, that Mandell's wife, Danielle Zipper-Mandell, was driving a black Toyota Corolla with Florida plates and that she would be there in four or five minutes. Moments later, on that same date, the NYPD lawfully intercepted and monitored a telephone call between Diano and Mandell in which Mandell told Diano "she will be pulling up in one minute her name is . . . Danielle." Diano then told Mandell, in sum and substance, "it's going to be an even thirty[.]" During this call, Diano and Mandell coordinated the delivery of illegal bookmaking proceeds.

73.     Similarly, on or about April 30, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Jerald Branca, another bookmaker in the Organization and a defendant charged in the Indictment. Branca told Diano, in sum and substance, that he had to give Diano "one package of one hundred and one package of five." Branca told Diano he could take care of it "tomorrow" morning. During this call, Diano and Branca coordinated the delivery of illegal bookmaking proceeds.

31

74. Further, on May 1, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Jerald Branca. Branca told Diano, in sum and substance, that he was a few minutes away from a car wash. Diano said, in sum and substance, that he would have his wife or someone else meet Branca. Diano then told Mandell, in sum and substance, "it's going to be an even thirty[.]"

## A. Diano $49,839 and Diano $15,401

75. Based, *inter alia*, on the above-described evidence of Diano's involvement in the Organization, on or about October 23, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, Diano's residence, the premises located at 6464 Tara Avenue, Las Vegas, Nevada.

76. On or about October 24, 2012, law enforcement agents lawfully searched Diano's residence pursuant to the warrant. During the search, law enforcement agents recovered, among other things, a total of $49,839.00 in United States currency, more or less (Diano $49,839); and casino gambling chips valued at approximately $15,401.00 in United States currency, more or less (Diano $15,401). During the search of Diano's residence, law enforcement agents also recovered evidence of illegal gambling activity, including wagering records, betting slips, and documents containing sports betting information.

## B. Diano $270,000

77. On or about February 22, 2012, Diano opened account number PRH000076575 at the Palms Casino in Las Vegas, Nevada, held in the name and/or for the benefit of Steven Diano (hereinafter, the "Diano Account"). Joseph Patterson was authorized to act as Diano's agent on the Diano Account. The Diano Account was also utilized for the use and benefit of Diano and Kyrollos.

32

78.     During the course of the Investigation, law enforcement agents conducted surveillance of Diano.  Law enforcement agents observed Diano's step-son, Joseph Patterson, pay or collect money on behalf of Diano and Kyrollos, in furtherance of the illegal gambling Organization.

79.     Lawfully intercepted and monitored telephone calls demonstrate that the Diano Account was used in furtherance illegal gambling activity and the Organization.  For example, on or about April 16, 2012, the NYPD lawfully intercepted and monitored a telephone call between Steven Diano and Brandt England, a co-defendant and member of the Organization. During this call, Diano stated, in sum and substance, that Diano had $250,000 and would have another $150,000 in about an hour.  England responded, in sum and substance, that this was fine, and he would meet Diano when Diano wanted to meet in 20 minutes.  A review of records from the Diano Account confirms a $150,000 withdrawal on or about April 16, 2012, approximately one hour after the call between Diano and England.

80.     On or about October 11, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Jerald Branca.  During this call, Diano told Branca, in sum and substance, to meet his "guy" at the Palms Casino.  Thereafter, law enforcement agents conducted surveillance of Branca and observed him meeting with Patterson and giving Patterson a bag.  Patterson then entered the Race and Sports Book area of the Palms Casino to deposit money into the Patterson Account.  Casino records from that day confirm that $150,000 was deposited into the Diano Account by Patterson.

81.     Based, *inter alia*, on the above, on or about November 19, 2012, United States Magistrate Judge Cheryl L. Pollak issued a warrant authorizing the seizure of all funds in the Diano Account and all proceeds traceable.  The warrant was executed by law enforcement

33

agents on or about November 20, 2012, and resulted in the seizure of approximately $270,000.00 in United States currency.

### Ian Mandell

82.     Based on the Investigation, law enforcement officials learned that Ian Mandell was an agent involved in the illegal gambling Organization.

83.     On or about December 1, 2011, the NYPD lawfully intercepted and monitored a telephone call between Mandell and Kyrollos. During the call, Mandell and Kyrollos discussed Mandell making cash payments to individuals in Las Vegas for Kyrollos in furtherance of the Organization.

84.     On or about December 2, 2011, a law enforcement agent conducted surveillance at the Fremont Hotel and Casino (the "Fremont Casino"). That morning, a law enforcement agent observed Mandell and his wife, Danielle Zipper-Mandell, arrive at the Fremont Casino. Mandell retrieved an orange bag from the back seat of his vehicle, and he and Danielle Zipper-Mandell entered the casino and went to the race and sports book. Later that morning, a law enforcement agent observed Mandell approach the cashier's cage of the Fremont Casino and access one of his safe deposit boxes at the Fremont Casino. Mandell removed approximately $150,000 from the safe deposit box and placed it, along with another $50,000 which was on his person, into the orange-colored bag. Moments later, Mandell exited the Fremont Casino valet and handed the orange bag to the driver of a Nissan sport utility vehicle.

85.     As previously alleged, on or about March 14, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Ian Mandell. Diano asked Mandell, in sum and substance, if Mandell needed "thirty" meaning $30,000, and told Mandell to retrieve it at the north valet of the Bellagio.

86.     Later that day, the NYPD lawfully intercepted and monitored a telephone

call between Diano and Mandell during which Mandell told Diano, in sum and substance, that

Mandell's wife, Danielle Zipper-Mandell, was driving a black Toyota Corolla with Florida plates

and that she would be there in four or five minutes. Moments later, on that same date, the NYPD

lawfully intercepted and monitored a telephone call between Diano and Mandell in which

Mandell told Diano, in sum and substance, "she will be pulling up in one minute her name is . . .

Danielle." Diano then told Mandell, in sum and substance, "it's going to be an even thirty[.]"

During this call, Mandell and Diano coordinated the delivery of illegal bookmaking proceeds.

87.     Later that day, on March 14, 2012, a law enforcement agents conducted

surveillance on Joseph Patterson, a step-son of Steven Diano. Patterson was observed in the

Race and Sports Book at the Bellagio. That afternoon, Patterson was observed walking from the

Race and Sports Book to the north valet. Patterson walked to a dark-colored Toyota Corolla

bearing Florida registration, driven by Danielle Zipper-Mandell. Patterson then handed Danielle

Zipper-Mandell a stack of cash approximately four inches thick. This observation, together with

the above calls, demonstrates that Mandell and his wife were involved in transporting and

holding large sums of gambling proceeds.

88.     On or about October 19, 2012, Ian Mandell checked into room 609 of

Fremont Hotel and Casino. Mandell conducted illegal gambling activity in furtherance of the

Organization from the Fremont Hotel and Casino.

89.     On or about October 23, 2012, the NYPD lawfully intercepted and

monitored a telephone call between Mandell and Kyrollos. During the call, Mandell advised

Kyrollos, in sum and substance, that "the guy" gave him $100,000 in Aria Casino chips.

Kyrollos responded, in sum and substance, "ok, I could clean that what else[?]" Mandell then

said, in sum and substance, "saya [sic] you and me are going to chop it you'll probably keep $200,000." Mandell then asked, in sum and substance, "When I drop . . . we're done for tonight, right?" Kyrollos then stated, in sum and substance, "You're not going to drop it till we're done so lock it up." In this call, Mandell and Kyrollos discussed safeguarding large quantities of currency and casino gambling chips.

90.     Later that day, on or about October 23, 2012, law enforcement agents observed Mandell enter the cage area of the Fremont Casino where the safe deposit boxes are located. Casino records show that Mandell accessed box numbers 1012, 1013, and 1041 that morning. In addition, Mandell was observed stuffing bundles of cash into three safe deposit boxes on that date.

### A. Mandell $100,000; Mandell-Zipper $150,000; and Mandell $150,000

91.     Based, *inter alia*, on the above, on or about October 25, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, safe deposit box no. 1012 held in the name and/or for the benefit of Ian Mandell, at the Fremont Hotel and Casino, Las Vegas, Nevada. On or about October 25, 2012, law enforcement agents lawfully searched this safe deposit box pursuant to the warrant and recovered, among other things, approximately $100,000.00 in United States currency (Mandell $100,000).

92.     Moreover, based, *inter alia*, on the above, on or about October 25, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, safe deposit box no. 1013 held in the name and/or for the benefit of Ian Mandell and Danielle Zipper-Mandell, at the Fremont Hotel and Casino, Las Vegas, Nevada. On or about October 25, 2012, law enforcement agents lawfully searched

36

this safe deposit box pursuant to the warrant and recovered, among other things, approximately $150,000.00 in United States currency (Mandell-Zipper $150,000).

93.     Further, based, *inter alia*, on the above, on or about October 25, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, safe deposit box no. 1041 held in the name and/or for the benefit of Ian Mandell, at the Fremont Hotel and Casino, Las Vegas, Nevada.  On or about October 25, 2012, law enforcement agents lawfully searched this safe deposit box pursuant to the warrant and recovered, among other things, approximately $150,000.00 in United States currency (Mandell $150,000).

### B. Mandell $49,350; Mandell $153,025; Mandell $145,386.35; Mandell $20,000; and Mandell $13,410

94.     Based, *inter alia*, on the above, on or about October 25, 2012, an agent of the Nevada State Gaming Control Board sought and obtained a warrant authorizing the search of Fremont Hotel and Casino, room 609, occupied by Ian Mandell, through the hotel's security department.

95.     On or about October 25, 2012, law enforcement agents lawfully searched room 609 of the Fremont Hotel and Casino pursuant to the warrant and recovered, among other things, winning gambling tickets valued at approximately $49,350.00 in United States currency (Mandell $49,350); winning gambling tickets valued at approximately $153,025.00 in United States currency (Mandell $153,025); winning gambling tickets valued at approximately $145,386.35 in United States currency (Mandell $145,386.35); approximately $20,000.00 in United States currency (Mandell $20,000); and approximately $13,410.00 in United States currency (Mandell $13,410).

**Paul Sexton**

96.    Based on the Investigation, law enforcement officials learned that Paul Sexton was a bookmaker in the Organization.

97.    On or about August 22, 2011, the NYPD lawfully intercepted and monitored a telephone call between Gadoon Kyrollos and Michael Colbert. During the call, Colbert and Kyrollos discussed setting up a meeting between "Sexman," an alias for Paul Sexton and "Horse," a nickname for Michael Jelinsky, a bettor. The purpose of the meeting was for Sexton to pay Jelinsky money that Kyrollos owed Jelinsky for winning wagers.

98.    Later that day, on or about August 22, 2011, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Sexton. In the call, Sexton and Kyrollos coordinated the delivery of illegal gambling proceeds.

99.    The following day, on or about August 23, 2011, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Sexton. Sexton told Kyrollos, in sum and substance, "I brought it with me" and "I would say I'll be there in eight minutes[.]"

100.   Minutes after the call, on or about August 23, 2011, a law enforcement agent positioned in the vicinity an "AM/PM" convenience store on St. Rose Parkway in Las Vegas, Nevada, observed Jelinsky approach the Sexton's vehicle, open the passenger side door, and lean into the vehicle. The law enforcement agent then observed Sexton hand Jelinsky a brown paper bag. The above calls, together with this observation, demonstrate that Sexton held and delivered gambling proceeds for the Organization.

101.   On or about October 27, 2011, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Ian Mandell. Mandell told Kyrollos, in sum and substance, that Mandell had "three ten ready for Paul[.]" Kyrollos then told Mandell, in sum

38

and substance, that "two fifty is perfect[.]" In this call, Mandell told Kyrollos that he had $310,000 ready to be picked up by Paul Sexton to deliver, and Kyrollos responded that $250,000 would be sufficient.

102.     Later that same day, on or about October 27, 2011, a law enforcement agent observed Paul Sexton receive a black bag from Ian Mandell at the Fremont Casino. Sexton was then observed with the black bag at the M Resort where he deposited cash at the Race and Sports Book Counter.

103.     Thereafter, on or about November 12, 2011, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos Joseph Paulk, another bookmaker in the Organization who has been charged as a defendant in the Indictment. Kyrollos asked Paulk, in sum and substance, whether Paulk had cash in Las Vegas that Kyrollos could use. Paulk responded, in sum and substance, that he could give Kyrollos "a hundred." In this call "a hundred" signifies $100,000.

104.     Later that day, on or about November 12, 2011, the NYPD lawfully intercepted and monitored a telephone call between Sexton and Kyrollos. Kyrollos told Sexton, in sum and substance, "he said I can get a hundred[.]" Sexton responded, in sum and substance, "he said you could take a hundred . . . . I'm driving home now for the safety deposit box keys." In this call, Sexton revealed that he stored large amounts of illegal gambling proceeds in a safety deposit box.

105.     On or about September 4, 2012, the NYPD lawfully intercepted and monitored a telephone call between Sexton and Kyrollos. In the call, Sexton told Kyrollos, in sum and substance, that Sexton was at the Bellagio and that his father was going to come meet him at the Bellagio and "sign me into that box."

106. Later that day, on or about September 4, 2012, the NYPD lawfully intercepted and monitored a telephone call between Sexton and Kyrollos. On the call, Sexton told Kyrollos, in sum and substance, that "He just gave me 35,800." Sexton was referring to illegal gambling proceeds.

107. Records from the Bellagio indicate that Sexton entered safe deposit box no. 3061 at least twice on September 4, 2012, and approximately 96 times between September 4 and October 23, 2012.

108. Based, *inter alia*, on the above, on or about October 23, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, safe deposit box no. 3061 held in the name and/or for the benefit of Paul Sexton and Keith Sexton, at the Bellagio Hotel & Casino, Las Vegas, Nevada

109. On or about October 31, 2012, law enforcement agents lawfully searched safe deposit box no. 3061 at the Bellagio pursuant to the warrant and recovered, among other things: casino gambling chips valued at approximately $79,008.00 in United States currency, more or less (Sexton $79,008); $74,966.00 in United States currency, more or less (Sexton $74,966); winning casino gambling tickets valued at approximately $741,397.25 in United States currency, more or less (Sexton $741,397.25); winning casino gambling tickets valued at approximately $34,745.45 in United States currency, more or less (Sexton $34,745.45); and winning casino gambling tickets valued at approximately $73,500.00 in United States currency, more or less (Sexton $73,500).

### Jerald Branca

110. Based on the Investigation, law enforcement officials learned that Jerald Branca was a bookmaker in the Organization.

111. On or about February 13, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and "Chris" LNU (last name unknown). In the call, Branca stated, in sum and substance, that because there was a shortage of cash, and that he was going to use Western Union money orders to complete a money transfer to Chris LNU; Branca wanted to confirm that Chris LNU was amenable to accepting the Western Union money orders. These discussions concerned proceeds of or money used by the illegal gambling Organization.

112. On or about March 13, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and "Doc," an unknown male. In this call, Branca told "Doc," in sum and substance, that Branca finished doing work and was getting ready to leave his house. Branca also told "Doc," in sum and substance, that he has "to see the guy at 6:30, the other guy at the Mirage at a quarter seven." Based on another lawfully intercepted and monitored telephone call between Branca and Brandt England, the "guy" Branca planned to meet was Daniel Monreal, another bookmaker in the Organization who is charged as a defendant in the Indictment. Branca also told Monreal, in sum and substance, that Monreal "had to log in the five . . . people I seen, I had to send the information in so it could get either picked up or dropped off money to five different people and he has to have the Internet accounts reflect the change in balances of these bettors."

113. On or about April 11, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and Brandt England. In this call, England asked Branca, in sum and substance, to give "Lou," an unknown individual, $23,644 because England needed to pay gambling proceeds to "Lou."

114. On or about April 27, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and Brandt England. Branca called England and said, in sum

41

and substance, "I'll be by your house with those chips between 10:30 a.m. and 10:45 a.m." Later
that day, law enforcement agents observed Branca park his vehicle in front of England's
residence located at 2817 High Sail Court, Las Vegas, Nevada. Moments later, England exited
his residence with nothing in his hands and approached the driver's side of Branca's vehicle.
England was then observed walking away from Branca's vehicle and had something small and
white in his left hand. As discussed above, the Organization used casino chips to pay and collect
money from bettors involved in illegal gambling activities.

115.    On or about June 25, 2012, the NYPD lawfully intercepted and monitored
telephone calls between Branca and Brandt England. In the first call, Branca said to England, in
sum and substance, "I'm trying to get out of the house and will be by your house at 11:45 a.m.
[PST] to pick up chips." England then told Branca, in sum and substance, that he will pay "Joe,"
referring to Joseph Paulk, $31,000 in casino chips and $19,000 in cash. In the second call,
Branca and England reviewed gambling figures. Branca stated, in sum and substance, that he
was going to pick up $140,000 from Baxter. Later that day, law enforcement agents observed
Branca meet Baxter at the Bellagio and Baxter gave Branca a sum of money. Thereafter, law
enforcement agents observed Branca arrive at the Aria Resort and Casino in Las Vegas, Nevada,
where he met with Joseph Paulk and gave Paulk a package.

116.    Based, *inter alia*, on the above, on or about October 23, 2012, a magistrate
judge in the United States District Court for the District of Nevada issued a warrant authorizing
the search of, among other places, Jerald Branca's residence, located 5415 W. Harmon Avenue,
Unit 1170, Las Vegas, Nevada.

117.    On or about October 24, 2012, law enforcement agents lawfully searched
Branca's residence pursuant to the warrant and recovered, among other things, a total of

42

approximately $266,329.00 in United States currency (Branca $266,329); casino gambling chips valued at approximately $186,000.00 in United States currency (Branca $186,000); and money orders valued at approximately $17,300.00 in United States currency (Branca $17,300). During the search of Branca's residence, law enforcement agents also recovered, among other items, records related to sport betting and a money counter.

### Brandt England

118.    Based on the Investigation, law enforcement officials learned that Brandt England was a bookmaker in the Organization.

119.    On or about February 1, 2012, the NYPD lawfully intercepted and monitored telephone a call between England and George Molsbarger, a defendant charged in the Indictment who is also an owner of Pinnacle Sports.  In this call, there are multiple references to a gambling sheet, which has the word "Harpo" and a corresponding number for different accounts. The next day, February 2, 2012, law enforcement officials lawfully intercepted, pursuant to a duly issued warrant, an email directed to the email address "agent@Pinnaclesports.com" from an email account controlled by Brandt England, lvbrandt@yahoo.com. The email stated, in sum and substance, "Set up xharpo3 to be 50 percent to harpo. He will open an account in the future. Thanks, Brandt." The subject heading of the email was "Per George." This email, in conjunction with this telephone call, shows that England and Molsbarger used Pinnacle Sports to process illegal bets and manage bettors' accounts.

120.    On or about April 9, 2012, the NYPD lawfully intercepted and monitored a telephone call between England and Daniel Monreal. In this call, England called Monreal because he needed to pay an unknown individual in New York $53,000 in gambling proceeds. Monreal advised that he knew an individual who lived in New York City who would able to help

England. Monreal stated, in sum and substance, that this unknown person would call England "to do his figure."

121.    On or about April 16, 2012, the NYPD lawfully intercepted and monitored a telephone call between Joseph Paulk and Thomas Lacerra, who were also bookmakers in the Organization and are charged as defendants in the Indictment. In this call, Paulk told Lacerra, in sum and substance, to meet an unknown individual and collect $40,000 for Pinnacle Sports. Later that day, on or about April 16, 2012, the NYPD lawfully intercepted and monitored a telephone call between George Molsbarger and Brandt England. In this call, England told Molsbarger, in sum and substance, that Lacerra left a message with Paulk indicating "that he [Lacerra] gonna pick up 50,000 to 60,000 this week." England further informed Molsbarger, in sum and substance, that Lacerra is owed $20,000 in "commission."

122.    As discussed above, on or about April 27, 2012, the NYPD lawfully intercepted and monitored a telephone call between Brandt England and Jerald Branca. Branca called England and said, in sum and substance, "I'll be by your house with those chips between 10:30 a.m. and 10:45 a.m." Later that day, law enforcement agents observed Branca park his vehicle in front of England's residence. Moments later, law enforcement agents observed England exit his residence with nothing in his hands and approached the driver's side of Branca's vehicle. England was then observed walking away from Branca's vehicle and had something small and white in his left hand. This call demonstrates that England kept illegal gambling proceeds at his residence.

123.    On or about June 14, 2012, the NYPD lawfully intercepted and monitored a telephone call between England and a wire room clerk. The clerk asked England, in sum and substance, "Are you home?" England responded, in sum and substance, "Yeah[.]" The clerk

then told England, in sum and substance, "I need you to get in your Pinnacle account, I gotta

check this for Mickey money that's all, we're looking for an amount of 33660." In this call, the

clerk verified whether a Pinnacle Sports account under England's control received a transfer of

$33,660 from an individual known as "Micky."

124.    A lawfully intercepted email that was sent from England's email account

on or about December 31, 2011, to "Agents@Pinnaclesports.com," stated, in sum and substance,

"Please make the credit $2,000,000 for hp205a." This email relates to a wager through Pinnacle

Sports and demonstrates England's ability to directly control Pinnacle's operation involving

bettors' accounts.

125.    Based, *inter alia*, on the above, on or about October 23, 2012, a magistrate

judge in the United States District Court for the District of Nevada issued a warrant authorizing

the search of, among other places, Brandt England's residence, located at 2817 High Sail Court,

Las Vegas, Nevada.

126.    On or about October 24, 2012, law enforcement agents lawfully searched

England's residence pursuant to the warrant and recovered, among other things, a total of

approximately $889,672.00 in United States currency (England $889,672); casino gambling

chips valued at approximately $145,396.00 in United States currency (England $145,396); and

casino gambling chips valued at approximately $7,025.00 in United States currency (England

$7,025).

### FIRST CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(A))

127.    Plaintiff repeats and realleges paragraphs 1 through 126 as if fully set forth

herein.

128.   The Defendant Assets were involved in transactions and/or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957.

129.   As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### SECOND CLAIM FOR RELIEF
### (18 U.S.C. § 981(a)(1)(C))

130.   Plaintiff repeats and realleges paragraphs 1 through 126 as if fully set forth herein.

131.   The Defendant Assets constitute proceeds or are derived from proceeds of property traceable to violations of 18 U.S.C. §§ 1084, 1952, and 1955.

132.   As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### THIRD CLAIM FOR RELIEF
### (18 U.S.C. § 1955(d))

133.   Plaintiff repeats and realleges paragraphs 1 through 126 as if fully set forth herein.

134.   The Defendant Assets were used in violation of 18 U.S.C. § 1955.

135.   As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 1955(d).

### JURY DEMAND

136.   Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all triable issues.

46

WHEREFORE, plaintiff, United States of America, requests that a warrant of this Court be issued for the arrest of the Defendant Assets; that due notice of these proceedings be given to all interested persons; that after further proceedings, the Defendant Assets be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action and such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
April 9, 2013

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
*Attorney for Plaintiff*
271 Cadman Plaza East
Brooklyn, New York 11201

By: _____

Ameet B. Kabrawala
Assistant U.S. Attorney
(718) 254-6001

## VERIFICATION

ANGELA JETT, being duly sworn, deposes and states as follows:

1.  I am Special Agent with the Federal Bureau of Investigation ("FBI") and am currently assigned to the Forfeiture Asset Seizure Team in New York.

2.  I have read the Verified Complaint *In Rem* in this action.

3.  The matters contained in the Verified Complaint *In Rem* are true and accurate to the best of my knowledge, information, and belief.

4.  The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers involved in the investigation, and my review of records lawfully obtained by state and federal law enforcement authorities.

5.  I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
    April 9, 2013

ANGELA JETT
Special Agent
Federal Bureau of Investigation

48