UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                        Plaintiff,

              -against-

TWO MILLION EIGHTY THOUSAND DOLLARS AND
NO CENTS ($2,080,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
MARCH 5, 2013, FORMERLY ON DEPOSIT IN
MORGAN STANLEY SMITH BARNEY ACCOUNT NO.
253-040072 IN THE NAME AND/OR FOR THE
BENEFIT OF STAN TOMCHIN, AND ALL PROCEEDS
TRACEABLE THERETO;

ONE HUNDRED THIRTY THOUSAND SEVEN
HUNDRED FORTY-SIX DOLLARS AND TWENTY-
FIVE CENTS ($130,746.25) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
OCTOBER 24, 2012, FROM THE PREMISES LOCATED
AT 12 AUTUMN LANE, FREEHOLD, NEW JERSEY,
AND ALL PROCEEDS TRACEABLE THERETO;

TEN THOUSAND DOLLARS AND NO CENTS
($10,000.00) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM A 2013 AUDI A6, VIN NO.
WAUGFAFCXDN024374, REGISTERED TO AND IN
THE POSSESSION OF GADOON L. KRYOLLOS,
SITUATED AT OR NEAR THE PREMISES LOCATED
AT 12 AUTUMN LANE, FREEHOLD, NEW JERSEY,
AND ALL PROCEEDS TRACEABLE;

NINETY-ONE THOUSAND ONE HUNDRED SIX
DOLLARS AND SEVENTY-FOUR CENTS ($91,106.74)
IN UNITED STATES CURRENCY, MORE OR LESS,
SEIZED ON OR ABOUT OCTOBER 24, 2012,
FORMERLY ON DEPOSIT IN FREEHOLD SAVINGS
BANK ACCOUNT NO. 0192008021 IN THE NAME
AND/OR FOR THE BENEFIT OF BOM ENTERPRISES,
LLC, AND ALL PROCEEDS TRACEABLE THERETO;

**AMENDED VERIFIED**
**COMPLAINT IN REM**

13-CV-2077 (CBA) (SMG)

FOUR HUNDRED FIFTY-THREE THOUSAND
SEVENTY-SEVEN DOLLARS AND THREE CENTS
($453,077.03) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT NOVEMBER 20,
2012, FORMERLY ON DEPOSIT AT THE M RESORT
SPA CASINO, LAS VEGAS, NEVADA, IN ACCOUNT
NO. MRH000006734 HELD IN THE NAME AND/OR
FOR THE BENEFIT OF THOMAS LUDFORD, AND
ALL PROCEEDS TRACEABLE THERETO;

FORTY-NINE THOUSAND EIGHT HUNDRED
THIRTY-NINE DOLLARS AND NO CENTS
($49,839.00), IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM THE PREMISES LOCATED AT 6464 TARA
AVENUE, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

CASINO GAMBLING CHIPS VALUED AT
APPROXIMATELY FIFTEEN THOUSAND FOUR
HUNDRED ONE DOLLARS AND NO CENTS
($15,401.00) IN UNITED STATES CURRENCY, MORE
OR LESS, SEIZED ON OR ABOUT OCTOBER 24, 2012,
FROM THE PREMISES LOCATED AT 6464 TARA
AVENUE, LAS VEGAS, NEVADA, AND ALL
PROCEEDS TRACEABLE THERETO;

TWO HUNDRED SEVENTY THOUSAND DOLLARS
AND NO CENTS ($270,000.00) IN UNITED STATES
CURRENCY, MORE OR LESS, SEIZED ON OR ABOUT
NOVEMBER 20, 2012, FORMERLY ON DEPOSIT IN
ACCOUNT NO. PRH000076575 HELD IN THE NAME
AND/OR FOR THE BENEFIT OF STEVEN DIANO AT
THE PALMS CASINO RESORT IN LAS VEGAS,
NEVADA, AND ALL PROCEEDS TRACEABLE
THERETO);

TWO HUNDRED SIXTY-SIX THOUSAND THREE
HUNDRED TWENTY-NINE DOLLARS AND NO
CENTS ($266,329.00) IN UNITED STATES CURRENCY,
MORE OR LESS, SEIZED ON OR ABOUT OCTOBER
24, 2012, FROM THE PREMISES LOCATED AT 5415 W.
HARMON AVENUE, UNIT 1170, LAS VEGAS,
NEVADA, AND ALL PROCEEDS TRACEABLE
THERETO;

CASINO GAMBLING CHIPS VALUED AT
APPROXIMATELY ONE HUNDRED EIGHTY-SIX
THOUSAND DOLLARS AND NO CENTS ($186,000.00)
IN UNITED STATES CURRENCY, MORE OR LESS,
SEIZED ON OR ABOUT OCTOBER 24, 2012, FROM
THE PREMISES LOCATED AT 5415 W. HARMON
AVENUE, UNIT 1170, LAS VEGAS, NEVADA, AND
ALL PROCEEDS TRACEABLE THERETO; and

MONEY ORDERS VALUED AT APPROXIMATELY
SEVENTEEN THOUSAND THREE HUNDRED
DOLLARS AND NO CENTS ($17,300.00) IN UNITED
STATES CURRENCY, MORE OR LESS, SEIZED ON OR
ABOUT OCTOBER 24, 2012, FROM THE PREMISES
LOCATED AT 5415 W. HARMON AVENUE, UNIT
1170, LAS VEGAS, NEVADA, AND ALL PROCEEDS
TRACEABLE THERETO,

                              Defendants *In Rem*.

Plaintiff, United States of America, by its attorney, LORETTA E. LYNCH,

United States Attorney for the Eastern District of New York, Ameet B. Kabrawala, Assistant

United States Attorney, of counsel, for its amended verified complaint *in rem*, hereby alleges,

upon information and belief, as follows.

## NATURE OF THE CASE

1.      Plaintiff, United States of America ("Plaintiff" or the "United States"),

brings this *in rem* civil forfeiture action to forfeit and condemn to the exclusive use and benefit

of the United States the above-captioned defendants *in rem*.  Such defendants *in rem*:  (a)

represent properties which constitute or are derived from proceeds traceable to violations of 18

U.S.C. §§ 1084, 1952 and 1955, and are therefore subject to forfeiture under 18 U.S.C. §

981(a)(1)(C); (b) represent properties involved in transactions or attempted transactions in

violation of 18 U.S.C. §§ 1956 and 1957, and are therefore subject to forfeiture under 18 U.S.C.

§ 981(a)(1)(A); and/or (c) represent properties used in violation of 18 U.S.C. § 1955(a), and are therefore subject to forfeiture under 18 U.S.C. § 1955(d).

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1355 and 1395 in that the acts and omissions giving rise to forfeiture occurred within the Eastern District of New York.

**THE DEFENDANTS *IN REM***

4.      Defendants *in rem* consist of the following (hereinafter collectively, the "Defendant Assets"):

a.      Two million eighty thousand dollars and no cents ($2,080,000.00) in United States currency, more or less, seized on or about March 5, 2013, formerly on deposit in Morgan Stanley Smith Barney account no. 253-040072 in the name and/or for the benefit of Stan Tomchin, and all proceeds traceable thereto (hereinafter, "Tomchin $2,080,000");

b.      One hundred thirty thousand seven hundred forty-six dollars and twenty-five cents ($130,746.25) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 12 Autumn Lane, Freehold, New Jersey, and all proceeds traceable thereto (hereinafter, "Kyrollos $130,746.25");

c.      Ten thousand dollars and no cents ($10,000.00) in United States currency, more or less, seized on or about October 24, 2012, from a 2013 Audi A6, VIN No. WAUGFAFCXDN024374, registered to and in the possession of Gadoon L. Kryollos, situated at

4

or near the premises located at 12 Autumn Lane, Freehold, New Jersey, and all proceeds traceable thereto (hereinafter, "Kyrollos $10,000");

    d.  Ninety-one thousand one hundred six dollars and seventy-four cents ($91,106.74) in United States currency, more or less, seized on or about October 24, 2012, formerly on deposit in Freehold Savings Bank account no. 0192008021 in the name and/or for the benefit of BOM Enterprises, LLC, and all proceeds traceable thereto (hereinafter, "Kyrollos-BOM $91,106.74");

    e.  Four hundred fifty-three thousand seventy-seven dollars and three cents ($453,077.03) in United States currency, more or less, seized on or about November 20, 2012, formerly on deposit at the M Resort Spa Casino, Las Vegas, Nevada, in account no. MRH000006734 held in the name and/or for the benefit of Thomas Ludford, and all proceeds traceable thereto (hereinafter, "Ludford $453,077.03");

    f.  Forty-nine thousand eight hundred thirty-nine dollars and no cents ($49,839.00), in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 6464 Tara Avenue, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $49,839");

    g.  Casino gambling chips valued at approximately fifteen thousand four hundred one dollars and no cents ($15,401.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 6464 Tara Avenue, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $15,401");

    h.  Two hundred seventy thousand dollars and no cents ($270,000.00) in United States currency, more or less, seized on or about November 20, 2012, formerly on deposit in account no. PRH000076575 held in the name and/or for the benefit of Steven Diano at

the Palms Casino Resort in Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Diano $270,000");

        i.     Two hundred and sixty-six thousand three hundred twenty-nine dollars and no cents ($266,329.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $266,329");

        j.     Casino gambling chips valued at approximately one hundred eighty-six thousand dollars and no cents ($186,000.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $186,000"); and

        k.     Money orders valued at approximately seventeen thousand three hundred dollars and no cents ($17,300.00) in United States currency, more or less, seized on or about October 24, 2012, from the premises located at 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada, and all proceeds traceable thereto (hereinafter, "Branca $17,300").

## STATUTORY FRAMEWORK

        5.     Pursuant to 18 U.S.C. § 1084(a), it is unlawful to knowingly use a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placement of bets or wagers on any sporting event or contest while engaged in the business of betting or wagering.  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1084(a) is subject to forfeiture to the United States.

6.      Pursuant to 18 U.S.C. § 1952(a)(1), it is unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a).  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952(a)(1) is subject to forfeiture to the United States.

7.      Pursuant to 18 U.S.C. § 1952(a)(3), it is unlawful to travel in interstate or foreign commerce or use the mail or any facility in interstate or foreign commerce with the intent to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a).  In turn, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1952(a)(3) is subject to forfeiture to the United States.

8.      Pursuant to 18 U.S.C. § 1955(a), "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined . . . or imprisoned not more than five years, or both."  Pursuant to 18 U.S.C. § 1955(b)(1), the term "illegal gambling business" is defined for purposes of Section 1955 as a gambling business which "(i) is a violation of the law of a State or political subdivision in which it is conducted; (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day."  Pursuant to 18 U.S.C. § 1955(d), "[a]ny property, including money, used in violation of the provisions of [Section 1955] may be seized and forfeited to the United States."  Moreover, pursuant to 18

U.S.C. § 981(a)(1)(C), "any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting a 'specified unlawful activity' [as defined in 18 U.S.C. § 1956(c)(7), and which includes violations of 18 U.S.C. § 1955], or a conspiracy to commit such offense" is subject to forfeiture to the United States.

9.     In turn, under the New York Penal Law ("NYPL") § 225.10(1), a person is guilty of "promoting gambling" in the first degree "when he knowingly advances or profits from unlawful gambling activity by: [e]ngaging in bookmaking to the extent that he receives or accepts in any one day more than five bets totaling more than five thousand dollars . . . ."

10.    Further, under the NYPL § 225.00(4), a person "'advances gambling activity' when, acting as other than a player, he engages in conduct which materially aids any form of gambling activity." NYPL § 225.00(4) identifies various types of conduct which may constitute gambling activity, including conduct "toward the arrangement of any of its financial or recording phases," and concludes with the catch-all phrase referring to conduct directed "toward any other phase of [a gambling] operation."

11.    Moreover, under Nevada law, Nev. Revised Statute §§ 465.092-094, it is unlawful for a person to directly or indirectly accept, receive or place, for compensation, a wager from another person within or outside the State of Nevada.

12.    Pursuant to 18 U.S.C. § 1956(a)(1), it is unlawful to conduct or attempt to conduct a financial transaction involving proceeds of specified unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a). A "financial transaction" is defined in 18 U.S.C. § 1956(c)(4) as a transaction which affects interstate or foreign commerce and, among other things, involves movement of funds by wire or by other means; or involves the use of a financial institution. Pursuant to 31 U.S.C. § 5312(a)(2)(X), a "financial institution" includes a casino or

gambling establishment. In turn, pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property, is subject to forfeiture to the United States.

13.     Pursuant to 18 U.S.C. § 1956(a)(2)(A), it is unlawful to transport, transmit or transfer, or attempt to transport, transmit or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit: illegal gambling, in violation of 18 U.S.C. § 1955(a). In turn, pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956, or any property traceable to such property is subject to forfeiture to the United States.

14.     Pursuant to 18 U.S.C. § 1957, it is unlawful to conduct a monetary transaction in criminally derived property in an amount greater than $10,000. Under 18 U.S.C. § 1957(f)(1), a monetary transaction is defined as a "deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through, or to a financial institution . . . ." In turn, pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1957, or any property traceable to such property, is subject to forfeiture to the United States.

15.     Pursuant to 18 U.S.C. § 984, in any *in rem* forfeiture action in which the subject property is cash or funds deposited into the account of a financial institution, the Government is not required to identify the particular funds involved in the offense, as any funds found in the same account within one year of the date of the offense are subject to forfeiture.

16.     Pursuant to 31 U.S.C. § 5363, "[n]o person engaged in the business of betting or wagering may knowingly accept, in connection with the participation of another

person in unlawful Internet gambling" credit or proceeds of credit, electronic funds transfer, checks, drafts, or similar financial instruments, or the proceeds of any other form of financial transaction.

### GENERAL BACKGROUND ON ILLEGAL GAMBLING ORGANIZATIONS

17.     Generally, an illegal gambling enterprise has an ascertainable hierarchical structure, a continuity of existence, and a criminal purpose beyond the scope of the individual acts of accepting wagers.  Illegal gambling enterprises are comprised of a group of persons sharing the common purpose of engaging in, and profiting from, the unlawful advancement of gambling.

18.     Master agents are at the top of the hierarchical structure and are those within the organization who oversee a group of bookmakers, agents, banks, and money collectors, and under whose accounts the agents take bets from the wagering public.  Master agents have authority to make certain managerial decisions and to extract a share of the agent's income from illegal wagering.

19.     Illegal gambling enterprises also employ "agents" whose job it is to build a clientele of bettors who will regularly bet with the enterprise.  Agents become the intermediary between the bettor and the enterprise itself, and it is the agent's job to "settle-up" usually on a designated day each week by collecting and paying out money owed.  There are generally two ways an agent operates:  he either places bets with the wire room for his bettors or the bettors call in the bets by identifying themselves to the agents by pre-arranged codes.  The agent is generally compensated by taking a percentage of his customers' losses.

20.     Bookmakers are those that direct the day-to-day operation of the illegal gambling enterprise.  They take bets, calculate odds, and pay out winnings.

21.     A wire room is a location through which bets are taken over the phone or via the Internet by clerks; it serves as a clearing house for collecting, dispensing, and accounting for money won and lost on sports bets and a place where records of gambling accounts for bookmakers and their associates are housed.  A head clerk supervises clerks and deals directly with the bookmaker; clerks answer telephone calls at the wire room and record bets called in by bettors.  An accountant maintains the financial records of the operation.  Together, the head clerk and accountant ensure that the gambling activity or "figures," are reconciled for the bookmaker.

22.     Many bookmaking operations have taken advantage of toll-free numbers and the Internet.  In this scenario, the bookmaker operates his enterprise locally while a wire room is located offshore, where gambling has been legalized.  Bettors can log onto an Internet website or call toll-free numbers to place bets to the offshore wire room directly, and not through the agent who is located in the United States.  In this case, the agent will regulate the online gambling site without taking bets directly from bettors.

23.     Illegal gambling enterprises also employ "money collectors," "money distributors," and "banks" to handle the flow of money between the participants of the enterprise. They are responsible for the collection and distribution of illegal gambling proceeds between the bookmaker and the agents and/or master/super agents.  "Banks" are responsible for holding large amounts of money for the operation and may be persons and entities.  This process of the collection, distribution and holding of large amounts of cash is necessary because federal law prohibits the use of wire transfers and credit cards in paying and collecting gambling debts. Additionally, bettors usually prefer that their winnings are paid in cash to avoid paying taxes and having a written record created of their illegal winnings.

## THE INVESTIGATION

24.     From in or around February 2011 through in or around October 2012, members of the Organized Crime Investigation Division ("OCID") of the New York City Police Department ("NYPD"), and the Queens County District Attorney's Office conducted a joint investigation (the "Investigation") into an illegal Internet gambling and messenger betting organization located in Queens County, New York and elsewhere, including in New Jersey, Pennsylvania, Nevada, and California (the "Organization").

25.     The Organization combined conventional bookmaking, messenger betting, and an unlawful Internet gambling network.  The Organization operated, *inter alia*, through the websites "www.pinnaclesports.com," "www.Jazzsports.net," "www.wager4you.com," "www.playhera.ag," and through various casinos in Las Vegas, Nevada.

26.     The Organization, which was devoted exclusively to illegal gambling, operated using the aforementioned websites, among others.  Proceeds of the gambling operation were transferred in several ways, including through safe deposit boxes, casino accounts located in Las Vegas, Nevada, wire transfers via domestic and foreign bank accounts, and by hand-to-hand exchanges of United States currency and casino gambling chips between members of the Organization.

27.     Members of the Organization included "bookmakers," "master agents," "agents," "banks," and "money collectors," among others.  Through their various roles, members of the Organization facilitated illegal gambling and money laundering activities of the Organization.

28.     As a result of the Investigation, approximately 25 participants in the Organization have been charged as defendants in Indictment No. 2593/2012 (the "Indictment")

filed on or about October 19, 2012 in the Supreme Court of the State of New York, Queens County.  The Indictment charges, *inter alia*, numerous gambling-related crimes, including various degrees of promoting gambling, money laundering, criminal conspiracy, and enterprise corruption.

29.     The following individuals, among others, are charged in the Indictment: Stanley Tomchin, Gadoon Kyrollos, and Steven Diano.  These individuals, and others, were arrested on or about October 24, 2012.

## THE DEFENDANT ASSETS

### Stanley Tomchin

30.     Stanley Tomchin is principal of Pinnacle Sports ("Pinnacle"), which maintains a website at www.pinnaclesports.com.  Pinnacle operates an online gambling website based in the Country of Curaçao.

31.     The Indictment charges Tomchin with Enterprise Corruption, Money Laundering in the First Degree, Money Laundering in the Second Degree, Money Laundering in the Third Degree, Money Laundering in the Fourth Degree, Promoting Gambling in the First Degree, and Conspiracy in the Fifth Degree.  The Enterprise Corruption and related charges arise out of the operation of an illegal bookmaking organization which operated in Queens County, New York and elsewhere.

32.     Although Pinnacle and similar gambling websites are based offshore, they serve players based in the United States.  Such gambling websites, including Pinnacle, offer "real money" casino games and sports betting to players in the United States, in violation of multiple federal criminal statutes, including but not limited to, 18 U.S.C. § 1084 (making it unlawful to use a wire in connection with placing a bet or wager), § 1955 (making it illegal to operate an

13

illegal gambling business), and § 1956 (money laundering).  Pinnacle Sports was used by the Organization to serve bettors in the United States and acted, *inter alia*, as a "bank" for the Organization.

33.    During the Investigation, the NYPD used a confidential informant ("CI") who provided reliable and corroborated information in connection with the Investigation.  At the direction of the NYPD, the CI used www.pinnaclesports.com to place bets for individuals in the United States.

34.    Further, a confidential witness ("CW-1"), who provided reliable and corroborated information and who was part of the criminal Organization, has admitted to law enforcement agents that Pinnacle accepted wagers from individuals in the United States and profited from illegal sports-betting activity from bettors in the United States.  As a principal of Pinnacle, Tomchin profited from illegal sports-betting activity from United States-based bettors.

35.    Pinnacle was integral to carrying out illegal sports-betting and laundering money for the Organization, of which Tomchin was a member.  For example, on or about July 19, 2011, during a lawfully intercepted and monitored telephone call, Gadoon Kyrollos, another co-defendant charged in the Indictment, told co-defendant Brandt England, in sum and substance, that "I need some green[.]  [A]re you going to give me Pinnacle money?"  England responded, in sum and substance, "Yes my [Pinnacle] account is LU 500[.]  Skype me with your Pinnacle number[.]"  England then said, in sum and substance, "[w]e can give you 250" signifying $250,000, to which Kyrollos said, in sum and substance, "Ok."  In this call, Kyrollos, who operated in New Jersey, requested that England wire transfer $250,000 of gambling proceeds supplied by Pinnacle for use by, and in furtherance of, the Organization.

36.     Similarly, on or about July 19, 2011, Kyrollos called an individual known as "Art" (also known as Mike) to launder through Pinnacle $100,000 in proceeds from New York-based wagering activity.  During a lawfully intercepted and monitored telephone call, Art indicated that he had a Pinnacle account and that some third-party who also had a Pinnacle account owed Art $100,000.  Art told Kyrollos that he needed to have the money "clean[ed] here in New York."  During this conversation, Art and Kyrollos arranged for the transfer of funds between Pinnacle accounts so that cash could be delivered to Art in person.

37.     Further, during the course of the Investigation, law enforcement officers executed court-authorized search warrants on Pinnacle's website.  Records obtained from the search of Pinnacle's website, coupled with evidence obtained from court-authorized wiretaps, revealed numerous instances in which members of the Organization based in the United States engaged in sports betting through Pinnacle.

38.     The Investigation further revealed that Tomchin caused the distribution of gambling proceeds from Pinnacle's accounts to other accounts controlled by Tomchin and his co-defendants in the United States, who would then withdraw large sums of cash, often exceeding $100,000, to pay out money owed to betters, bookmakers, and other persons in the United States.

39.     For example, during a lawfully intercepted and monitored telephone call on or about May 19, 2012, Tomchin's co-defendants Brandt England and George Molsbarger discussed the distribution of $335,000 in New York through Tomchin's sister, Joy Tomchin. Molsbarger and England agreed that England called Tomchin to ask if Tomchin could arrange for the distribution of cash through his sister, Joy.  Minutes later, law enforcement officers lawfully intercepted and monitored a telephone call between England and Stanley Tomchin.  In

15

the call, Stanley Tomchin authorized and coordinated with England to deliver $335,000 in cash to Joy Tomchin.  England also called co-defendant Joseph Paulk to arrange for the transfer of cash to Joy Tomchin.  In turn, Paulk advised Kyrollos of the cash delivery, and Kyrollos contacted his associate and co-defendant Michael Duong, another bookmaker in the Organization, to pick up money from a third-party and deliver the same amount "to a sister of a Pinnacle guy" in New York.  Subsequently, on or about May 21, 2012, a law enforcement official observed Michael Duong meet with Joy Tomchin and hand her a plastic bag.  This surveillance was consistent with the intercepted telephone calls in which the transfer of cash was arranged.

40.     Tomchin engaged in other similar calls and transactions, which reflect that he transferred large sums of money from Pinnacle to co-defendants and bettors in the United States in furtherance of the illegal gambling Organization.  For example, on or about June 21, 2012, Stanley Tomchin called Pinnacle and directed a wire room clerk to credit the Pinnacle account of a co-defendant, Brandt England, $350,000 because England had that amount delivered in cash to Tomchin's sister in New York.  Later that day, Stanley Tomchin was recorded asking his sister, in sum and substance, whether she received "three fifty worth of grapes[,]" to which his sister responded, in sum and substance, "yes."  Stanley Tomchin used code, calling the cash "grapes" in an attempt to thwart any eavesdropping by law enforcement officials.

41.     Lawfully intercepted and monitored telephone calls revealed that Tomchin was aware that his activities may be subject to monitoring by law enforcement authorities.  For example, during one such call, Tomchin stated, in sum and substance, that communication by

facsimile is preferable to telephone calls because faxed communications can be shredded and law enforcement can obtain a wiretap to monitor telephone calls.

42.     Further, on or about May 8, 2012, the NYPD intercepted a telephone call between two of Tomchin's co-defendants, Brandt England and Kelly Barsel, whom the Investigation revealed were bookmakers in the Organization.  England and Barsel discussed the seizure of approximately $1,500,000 in United States currency by law enforcement officials from a money collector for the Organization and how the seizure might impact their ability to distribute gambling proceeds to bettors based in the United States.  In the call, England said, in sum and substance, "we got customers we need to pay this week and . . . no real way to pay em . . . . I need the money for a couple weeks until I can get reimbursed from Pinnacle . . . ."  Later that day, on or about May 8, 2012, England explained to Barsel, in sum and substance, "[I]'m owed probably about a million . . . 900 to 1.1 depending on a couple of transfers . . . . I paid out some already, we owe close to 5 still this week. . . .  if you think Pinnacle not gonna pay us – then we shouldn't be in this business . . . ."  During that conversation, England reassured Barsel, in sum and substance, that "Pinnacle thinks they'll get it [the seized $1,500,000] back if they don't I think we'll have to write it up through the company."

43.     The next day, May 9, 2012, England and Barsel continued to discuss the seizure of $1,500,000 by law enforcement officials.  In a lawfully intercepted and monitored telephone call from that day, Barsel asked England, in sum and substance, "Pinnacle stands by it right?  What if this money [the seized $1.5 million] goes missing?"  In the foregoing calls from May 8-9, 2012, Barsel and England confirmed that Pinnacle acted as a bank or financial backer by providing money to members of the Organization in the United States in furtherance of their illegal gambling enterprise.

17

44.     According to CW-1, approximately $1,500,000 seized by law enforcement agents in May 2012 was replaced within days through loans from other individuals involved in Pinnacle.

45.     Providing and receiving loans, often in the form of cash, helps to facilitate the distribution of illegal gambling proceeds and/or minimize the disruption of the illegal gambling organization if cash becomes unavailable.  Pinnacle has a network of individuals, including professional gamblers, in the United States that receive and distribute money on its behalf.

46.     CW-1 advised law enforcement agents that Pinnacle generally would distribute profits to its principals once per year, toward the end of the year.  Distribution of profits would generally occur by wire transfer into the personal bank accounts of Pinnacle's principals or by the distribution of cash proceeds.

47.     Stanley Tomchin maintains several accounts at Morgan Stanley Smith Barney ("MSSB"), including account no. 253-040072 held in the name and/or for the benefit of Stanley Tomchin (hereinafter, the "Tomchin MSSB Account").  The Tomchin MSSB Account was controlled by Stanley Tomchin and used to receive and distribute funds from Pinnacle.

48.     The Tomchin MSSB Account received numerous wire transfers from an account held by the Toronto Dominion Bank in Canada ("TD Bank") which, in turn, received a large wire transfer from a bank located in Curaçao, where Pinnacle is based.

49.     Specifically, on or about December 13, 2011, Tomchin's TD Bank account, account no. 7152841 (hereinafter, the "TD Bank Account"), received a wire transfer in the amount of $4,385,965.00 from "Cevuha N.V." located at the street address of "Pater Ewwensweg 31 (Second Floor), Willemstad, Curaçao, Netherlands Antilles."  According to

Pinnacle's website, Pinnacle's "Head Office" is located at "Pater Euwensweg 31" in Willemstad, Curaçao.

50.     An Internet search reveals that "Cevuha N.V." is related to Pinnacle Sports in that "Cevuha N.V." is the alias of Pinnacle Sports on the Internet-based wire transfer service WebMoney Transfer, which was accessible at www.wmtransfer.com. According to WebMoney Transfer's website, Cevuha N.V. has a WebMoney identification number of "WMID828245830532" belonging to "Pinnacle Sports Worldwide." Further, WebMoney Transfer's webpage for Cevuha N.V. lists the following email address under the "contact" information section: csd@pinnaclesports.com. This is the same "contact" email listed on Pinnacle's website.

51.     Following Pinnacle's transfer of $4,385,965.00 to Tomchin's TD Bank Account, there were approximately five wire transfers from the TD Bank Account to the Tomchin MSSB Account, totaling approximately $2,080,000.00; specifically, approximately $800,000.00 was transferred on or about March 30, 2012; approximately $500,000.00 was transferred on or about May 15, 2013; approximately $180,000.00 was transferred on or about June 14, 2012; approximately $300,000.00 was transferred on or about July 23, 2012; and approximately $300,000.00 was transferred on or about August 23, 2012. The TD Bank Account was an account through which monies received from Pinnacle were transferred to the Tomchin MSSB Account.

52.     Based on evidence obtained during the Investigation, it is estimated that the Organization placed through Pinnacle in excess of $5 million in sports betting wagers over an 18-month period by accepting wagers from individuals in the United States on a wide variety of sporting events.

53.     The Tomchin MSSB Account was not only used to receive and distribute illegal gambling proceeds from Pinnacle, it was involved in the laundering of these proceeds because monies received from Pinnacle, by way of the TD Bank Account, were placed into the MSSB Account to conceal their origin and to make illegal gambling proceeds appear as monies derived from legitimate or lawful sources.  This is consistent with Stanley Tomchin causing the transfer of illegal gambling proceeds from Pinnacle's accounts to other accounts and repositories controlled by Tomchin and his co-defendants in the United States, for distribution in the United States to bookmakers and bettors, among others.

54.     Account activity from the TD Bank Account and the MSSB Account reflects that large amounts of funds, collectively exceeding $1,800,000, were transferred from those accounts to Dennis Carlston, a convicted felon and gambler, between in or about April and July 2012.  Additionally, on or about September 16, 2011, approximately $300,000 was transferred from the Tomchin MSSB Account to Carlston.  When Carlston was asked by law enforcement authorities about these transfers, Carlston indicated that they were loans, but he failed to provide any documentation to support his claims or otherwise discuss the terms of the loan.

55.     In addition, the Tomchin MSSB Account received funds that originated from Illya Trincher, a member of a criminal enterprise that ran an illegal gambling business that catered primarily to multi-millionaire and billionaire clients in the United States.  Trincher's criminal enterprise utilized several online gambling websites.  CW-1 confirmed that Trincher used Pinnacle and that Trincher resides in the United States.

56.     Trincher has been charged, *inter alia*, with violations of 18 U.S.C. §§ 1962(d) (RICO Conspiracy); 1962(c) (RICO); 1956(h) (Money Laundering Conspiracy); 1955

(Operating an Illegal Gambling Business); 894 (Extortion Conspiracy);1084 (Transmission of Wagering Information); 31 U.S.C. § 5363 and 5366 (Unlawful Internet Gambling); and 31 U.S.C. § 5324 (structuring) in an indictment filed in the United States District Court for the Southern District of New York.

57.    On or about February 17, 2012, Trincher wire transferred approximately $121,200.00 into Morgan Stanley Smith Barney account no. 253-040507707, which is another account controlled by Stanley Tomchin as trustee for "Grasscourt" (hereinafter, the "Grasscourt Account").  The Grasscourt Account is registered to the same physical address as the Tomchin MSSB Account.

58.    On or about March 8, 2012, approximately $275,000.00 was transferred out of the Grasscourt Account and the same amount was deposited into the Tomchin MSSB Account on the same date.

59.    On or about October 23, 2012 and January 14, 2013, United States Magistrate Judge Robert M. Levy of the United States District Court for the Eastern District of New York issued, upon the application of the United States, warrants authorizing the seizure of the Tomchin MSSB account up to and including the sum of $2,080,000.00, and all proceeds traceable thereto.

60.    Thereafter, the United States and Stanley Tomchin agreed, pursuant to a Stipulation and Order endorsed by the Court on or about February 27, 2013, to substitute cash funds totaling $2,080,000.00 in lieu of the funds held in the Tomchin MSSB Account (Tomchin $2,080,000).  Pursuant to said Stipulation and Order, such funds were transferred to the United States Marshals Service on or about March 5, 2013.

## Gadoon Kyrollos

61.     Based on the Investigation, law enforcement agents learned that Kyrollos was a bookmaker and agent in the illegal gambling Organization.  Observations of Kyrollos during the period of the Investigation failed to reveal any source of legitimate employment.

62.     Kyrollos was a leader in the Organization and caused millions of dollars of illegal wagers to be placed through online gambling websites, including Pinnacle, from the United States.  During the course of the Investigation, Kyrollos used wire communication facilities for the transmission in interstate and foreign commerce of betting and wagering information and assisted others in the placement of bets and wagers on sporting events and contests.  The transmission of such bets and wagers entitled recipients to receive money and credit as a result of bets and wagers.

63.     For instance, on or about September 10, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and a man identified only as "Peter."  "Peter" stated, in sum and substance, "I need a favor from you[.]  Robbie needs money in Cris and Pinnacle[.]  I got all this money in New York[.]  [W]ould you make the transfer[?]  I want to give you money in New York, I need Pinnacle money[.]"  In this call, "Peter" was referring to two offshore gambling websites, "Chris" and "Pinnacle."  The website referred to as "Chris" is accessible at www.betchris.com; "Pinnacle" refers to www.pinnaclesports.com.  In this call, Kyrollos agreed to assist "Peter" by accepting his gambling cash proceeds and arranging for credits on the web sites for Peter's associate, "Robbie."

64.     On or about October 1, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Michael Duong, another bookmaker in the Organization and a defendant charged in the Indictment.  During the call, Kyrollos asked Duong,

in sum and substance, "when you are going to run balances[?]"  Duong told Kyrollos, in sum and substance, that they need "a few minutes" to get "figures" and "balances."  Kyrollos then said, in sum and substance, "we have to make sure we are on top of . . . those figures."  "Figure" is a term commonly used by bookmakers to refer to gambling account balance, that is, the monies owed as a result of illegal gambling.  This conversation demonstrates a relationship between Kyrollos and Duong that was based on illegal gambling activity.

### A.  Kyrollos $130,746.25 and Kyrollos $10,000

65.     Based, *inter alia*, on the above-described evidence of Kyrollos' involvement in the Organization, on or about October 23, 2012, a magistrate judge in the United States District Court for the District of New Jersey issued a warrant authorizing the search of, among other places, Kyrollos' residence, the premises located at 12 Autumn Lane, Freehold, New Jersey.

66.     On or about October 24, 2012, law enforcement agents lawfully searched Kyrollos' residence.  During the search, Kyrollos advised law enforcement agents of two locations within his residence where he stored large amounts of currency and stated, in sum and substance, that there were no other places in which he stored cash.  However, during the search, law enforcement agents recovered large amounts of currency in locations other than those Kyrollos had indicated.  Law enforcement agents recovered and seized a total of $130,746.25 in United States currency, more or less, from Kyrollos's residence pursuant to the warrant (Kyrollos $130,746.25) and $10,000 in United States currency, more or less, from his vehicle (Kyrollos $10,000).  Agents also recovered evidence of illegal gambling activity during the search of Kyrollos's residence, including casino betting slips, gambling and betting records,

documents related to gambling, notes on sports players, a parlay card, books on sports betting, gambling tables, and a slot machine.

### B. Kyrollos-BOM $91,106.74

67.     In or around September 2011, Kyrollos opened an account, number 0192007920 (the "predecessor account"), held in the name of BOM Enterprises, LLC ("BOM") at Freehold Savings Bank in Freehold, New Jersey.  This account was subsequently closed by Kyrollos on or about July 27, 2012 following a July 11, 2012 transfer of over $91,000 which Kyrollos claimed to the bank was a theft as a result of a forged check.

68.     On or about July 27, 2012, Kyrollos opened account number 0192008021 in the name of BOM at Freehold Savings Bank (the "BOM Account") in Freehold, New Jersey. The balance of the predecessor account was transferred to the BOM Account on or about July 27, 2012.

69.     BOM was incorporated in the State of New Jersey on or about March 23, 2010.  The incorporating documents reflect that BOM's business purpose was "Technology Consulting and Services."

70.     Based on evidence obtained during the Investigation, law enforcement officials learned that BOM's sole purpose was to promote the illegal gambling operation of the Organization.  The BOM Account was used to launder the proceeds of that illegal gambling business.

71.     Specifically, a review of bank records and surveillance indicated that the BOM Account was used to accept overseas wire transfers from companies identified in the Investigation, based in the Cayman Islands and in Hong Kong.

24

72.     Lawfully intercepted telephone conversations corroborated deposits and showed a pattern of bets being placed in the amount of corresponding deposits.  After the overseas transfers were made into the BOM Account, Kyrollos made payments in the name of "BOM Enterprises Payroll," through which he would pay himself and his co-defendants in the Organization, among others.  The Investigation revealed that all but two deposits into the BOM Account resulted from overseas wires; both of these deposits were from Kyrollos' co-conspirators.

73.     Records for the BOM Account indicate that Kyrollos paid himself a salary from the BOM Account.  For example, at least three checks were drawn on the BOM Account and made payable to Kyrollos, and each of these checks list "Salary" in the memo line.  The first was dated November 2, 2011 and was in the amount of $17,551.75, the second was dated November 30, 2011 and was in the amount of $21,277.75, and the third was dated December 28, 2011 and was in the amount of $25,337.00.  Similar transfers were made in or around August 2012.

74.     Furthermore, email lawfully intercepted during the Investigation revealed that Kyrollos instructed agents in the Organization to remit payment of gambling proceeds to BOM via wire transfers.  For example, on or about March 19, 2012, an email message was sent from Kyrollos's email address, virtusprosports@hotmail.com, to a bookmaker in Costa Rica. The email stated, in sum and substance, "Please wire 48695 to our account at Freehold Savings Bank.  Unfortunately I do not have the wire information at this time because we changed email addresses. You may have that info in a previous email.  Let me know if you cannot retrieve the bank wire into [sic]. Thanks, Sincerely Spanky's Office."  The number 48695 represented $48,695.  Further, this email demonstrated that Kyrollos, a/k/a Spanky, directed others involved

in the illegal gambling Organization to wire payments into Freehold Saving Bank, where the BOM Account was held.

75.     Based, *inter alia*, on the above, on October 23, 2012, United States Magistrate Judge Robert M. Levy issued a warrant authorizing the seizure of all funds on deposit in the BOM Account and all proceeds traceable thereto.  The warrant was executed by law enforcement agents on or about October 24, 2012 and resulted in the seizure of approximately $91,106.74 in United States currency.

### Thomas Ludford

76.     Beginning in or around July 2012, numerous lawfully intercepted telephone calls revealed that Kyrollos attempted to recruit bettors to make wagers for him at a sports book located within the M Resort and Casino in Las Vegas.  During this time period, Kyrollos spoke with Thomas Ludford, among others, in an attempt to convince Ludford to work for Kyrollos.

77.     Account number MRH000006734 at the M Resort in Las Vegas was held in the name and/or for the benefit of Thomas Ludford (hereinafter, the "Ludford Account").

78.     On or about September 5, 2012, the NYPD lawfully intercepted and monitored a telephone call between Ludford and Kyrollos.  During the call, Ludford told Kyrollos that Ludford could bet up to ten thousand dollars per game on Kyrollos' behalf.

79.     On or about September 6, 2012, the NYPD lawfully intercepted and monitored a telephone call between Kyrollos and Ludford.  In the call, Kyrollos called Ludford to tell Ludford, in sum and substance, that he "[f]ucked up" the placement of a wager and that is was a big mistake.  Ludford asked, in sum and substance, what the error was, and Kyrollos explained that all calls to the wire room are taped.  Kyrollos then played back the relevant call

26

for Ludford in which Ludford was supposed to place a wager for "383 / + 8 ½" but instead

placed a wager for "383 / - 8 ½." Kyrollos then asked Ludford, in sum and substance, how

Ludford would correct the mistake, to which Ludford replied, in sum and substance, to deduct it

from Ludford's pay. Kyrollos told Ludford, in sum and substance, that they can "make a lot of

money doing this. I want to see you get paid, I don't want to take money out of your pocket."

Kyrollos then told Ludford, in sum and substance, to consider it an early "Christmas bonus" and

Ludford said, in sum and substance, that it would never happen again. This call demonstrates

that Ludford conducted illegal gambling on Kyrollos' behalf in furtherance of the Organization,

and was paid for doing so.

80.     On or about September 19, 2012, the NYPD lawfully intercepted and

monitored a telephone call between Kyrollos and Ludford. During the call, Kyrollos told

Ludford, in sum and substance, that he needed Ludford to "pick up some money because we're

running a little low." Kyrollos then gave Ludford instructions, telling him, in sum and

substance, to call "715-8364. Guy's name is Grey . . . . Pick up 62,500 . . . you stick that in the

account. Make him come to you if you can . . . . Meet in the lobby or something . . . ." In this

call, Kyrollos gave Ludford instructions on where to pick up money intended for the Ludford

Account and to deposit the same into that account. Casino records for the Ludford Account

confirmed that approximately $60,000 in United States currency was deposited into the Ludford

Account later that day.

81.     On or about September 23, 2012, the NYPD lawfully intercepted and

monitored a telephone call between Ludford and Kyrollos. During the call, Ludford asked

Kyrollos, in sum and substance, to confirm whether "we [are] going to be done like we always

are, you know, at 5:30 [p.m.] when the game goes off." Kyrollos then told Ludford, in sum and

substance, "Yeah, that's fine."  Later in the call, Kyrollos said, in sum and substance, "You winning or losing in that account means nothing to be honest.  You could lose a million and we'll still have a good week . . . so it doesn't really matter.  We just need the numbers to fall and that's it so the Jets four and three that was big for us."  In this call, Kyrollos confirmed his role as the actual account holder for the Ludford Account and alluded to the larger scope of the illegal gambling Organization.

82.     Between February 2012 and October 2012, over $800,000.00 was deposited into the Ludford Account.

83.     Based, *inter alia*, on the above, on November 19, 2012, United States Magistrate Judge Cheryl L. Pollak of the United States District Court for the Eastern District of New York issued a warrant authorizing the seizure of all funds on deposit in the Ludford Account and all proceeds traceable thereto.  The warrant was executed by law enforcement agents on or about November 20, 2012 and resulted in the seizure of approximately $453,077.03 in United States currency.

**<u>Steven Diano</u>**

84.     Based on the Investigation, law enforcement officials learned that Steven Diano was a bookmaker involved in the illegal gambling Organization, as he routinely took wagers, instructed others to place wagers at various Las Vegas casinos, and paid for and collected money used in illegal gambling.  Observations of Diano during the period of the Investigation failed to reveal any source of legitimate employment, and Diano conducted bookmaking activities from his residence.

85.     For example, on or about November 28, 2011, the NYPD lawfully intercepted and monitored a telephone call between Diano and another individual, K. Gillman, in

which Diano instructed this individual to meet someone at the north valet of the Bellagio Hotel and Casino (the "Bellagio") in Las Vegas, Nevada.

86.     Minutes after this call, on or about November 28, 2011, the NYPD lawfully intercepted and monitored a telephone call between Diano and his step-son, Joseph Patterson.  In the call, Diano told Patterson, in some and substance, to put together "one hundred fifty" in cash, to which Patterson responded, in sum and substance, "one hundred fifty thousand, ok[.]"

87.     Thereafter, on or about November 28, 2011, law enforcement agents observed Patterson, who was in the Race and Sports Book at the Bellagio, walk to the north valet.  When Patterson arrived at the north valet, Gilman exited a dark-colored vehicle and waved to Patterson.  Patterson approached Gilman and handed Gilman bundles of cash.  The foregoing calls, coupled with the observation, demonstrate that Diano coordinated the delivery of illegal gambling proceeds.

88.     On or about February 6, 2012, law enforcement agents observed Diano meet with Kyrollos and Michael Duong at a restaurant in Las Vegas, Nevada.  Lawfully intercepted and monitored telephone calls reveal that Diano and Kyrollos are both members of the Organization.

89.     For example, on or about March 14, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Ian Mandell, an agent in the Organization and a defendant charged in the Indictment.  Diano asked Mandell, in sum and substance, whether Mandell needed "thirty" meaning $30,000, and told Mandell to pick it up at the Bellagio.  Diano instructed Mandell to meet at the north valet of the Bellagio.  Later that day, the NYPD lawfully intercepted and monitored another telephone call between Diano and Mandell during which

Mandell told Diano, in sum and substance, that Mandell's wife, Danielle Zipper-Mandell, was driving a black Toyota Corolla with Florida plates and that she would be there in four or five minutes.  Moments later, on that same date, the NYPD lawfully intercepted and monitored a telephone call between Diano and Mandell in which Mandell told Diano "she will be pulling up in one minute her name is . . . Danielle."  Diano then told Mandell, in sum and substance, "it's going to be an even thirty[.]"  During this call, Diano and Mandell coordinated the delivery of illegal bookmaking proceeds.

90.     Similarly, on or about April 30, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Jerald Branca, another bookmaker in the Organization and a defendant charged in the Indictment.  Branca told Diano, in sum and substance, that he had to give Diano "one package of one hundred and one package of five."  Branca told Diano he could take care of it "tomorrow" morning.  During this call, Diano and Branca coordinated the delivery of illegal bookmaking proceeds.

91.     Further, on May 1, 2012, the NYPD lawfully intercepted and monitored a telephone call between Diano and Jerald Branca.  Branca told Diano, in sum and substance, that he was a few minutes away from a car wash.  Diano said, in sum and substance, that he would have his wife or someone else meet Branca.  Diano then told Mandell, in sum and substance, "it's going to be an even thirty[.]"

### A.  Diano $49,839 and Diano $15,401

92.     Based, *inter alia*, on the above-described evidence of Diano's involvement in the Organization, on or about October 23, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, Diano's residence, the premises located at 6464 Tara Avenue, Las Vegas, Nevada.

93.     On or about October 24, 2012, law enforcement agents lawfully searched Diano's residence pursuant to the warrant.  During the search, law enforcement agents recovered, among other things, a total of $49,839.00 in United States currency, more or less (Diano $49,839); and casino gambling chips valued at approximately $15,401.00 in United States currency, more or less (Diano $15,401).  During the search of Diano's residence, law enforcement agents also recovered evidence of illegal gambling activity, including wagering records, betting slips, and documents containing sports betting information.

**B. Diano $270,000**

94.     On or about February 22, 2012, Diano opened account number PRH000076575 at the Palms Casino in Las Vegas, Nevada, held in the name and/or for the benefit of Steven Diano (hereinafter, the "Diano Account").  Joseph Patterson was authorized to act as Diano's agent on the Diano Account.  The Diano Account was also utilized for the use and benefit of Diano and Kyrollos.

95.     During the course of the Investigation, law enforcement agents conducted surveillance of Diano.  Law enforcement agents observed Diano's step-son, Joseph Patterson, pay or collect money on behalf of Diano and Kyrollos, in furtherance of the illegal gambling Organization.

96.     Lawfully intercepted and monitored telephone calls demonstrate that the Diano Account was used in furtherance illegal gambling activity and the Organization.  For example, on or about April 16, 2012, the NYPD lawfully intercepted and monitored a telephone call between Steven Diano and Brandt England, a co-defendant and member of the Organization.  During this call, Diano stated, in sum and substance, that Diano had $250,000 and would have another $150,000 in about an hour.  England responded, in sum and substance, that this was fine,

and he would meet Diano when Diano wanted to meet in 20 minutes.  A review of records from

the Diano Account confirms a $150,000 withdrawal on or about April 16, 2012, approximately

one hour after the call between Diano and England.

97.     On or about October 11, 2012, the NYPD lawfully intercepted and

monitored a telephone call between Diano and Jerald Branca.  During this call, Diano told

Branca, in sum and substance, to meet his "guy" at the Palms Casino.  Thereafter, law

enforcement agents conducted surveillance of Branca and observed him meeting with Patterson

and giving Patterson a bag.  Patterson then entered the Race and Sports Book area of the Palms

Casino to deposit money into the Patterson Account.  Casino records from that day confirm that

$150,000 was deposited into the Diano Account by Patterson.

98.     Based, *inter alia*, on the above, on or about November 19, 2012, United

States Magistrate Judge Cheryl L. Pollak issued a warrant authorizing the seizure of all funds in

the Diano Account and all proceeds traceable.  The warrant was executed by law enforcement

agents on or about November 20, 2012, and resulted in the seizure of approximately $270,000.00

in United States currency.

## Jerald Branca

99.     Based on the Investigation, law enforcement officials learned that Jerald

Branca was a bookmaker in the Organization.

100.    On or about February 13, 2012, the NYPD lawfully intercepted and

monitored a telephone call between Branca and "Chris" LNU (last name unknown).  In the call,

Branca stated, in sum and substance, that because there was a shortage of cash, and that he was

going to use Western Union money orders to complete a money transfer to Chris LNU; Branca

wanted to confirm that Chris LNU was amenable to accepting the Western Union money orders. These discussions concerned proceeds of or money used by the illegal gambling Organization.

101.    On or about March 13, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and "Doc," an unknown male.  In this call, Branca told "Doc," in sum and substance, that Branca finished doing work and was getting ready to leave his house.  Branca also told "Doc," in sum and substance, that he has "to see the guy at 6:30, the other guy at the Mirage at a quarter seven."  Based on another lawfully intercepted and monitored telephone call between Branca and Brandt England, the "guy" Branca planned to meet was Daniel Monreal, another bookmaker in the Organization who is charged as a defendant in the Indictment.  Branca also told Monreal, in sum and substance, that Monreal "had to log in the five . . . people I seen, I had to send the information in so it could get either picked up or dropped off money to five different people and he has to have the Internet accounts reflect the change in balances of these bettors."

102.    On or about April 11, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and Brandt England.  In this call, England asked Branca, in sum and substance, to give "Lou," an unknown individual, $23,644 because England needed to pay gambling proceeds to "Lou."

103.    On or about April 27, 2012, the NYPD lawfully intercepted and monitored a telephone call between Branca and Brandt England.  Branca called England and said, in sum and substance, "I'll be by your house with those chips between 10:30 a.m. and 10:45 a.m."  Later that day, law enforcement agents observed Branca park his vehicle in front of England's residence located at 2817 High Sail Court, Las Vegas, Nevada.  Moments later, England exited his residence with nothing in his hands and approached the driver's side of Branca's vehicle.

England was then observed walking away from Branca's vehicle and had something small and white in his left hand. As discussed above, the Organization used casino chips to pay and collect money from bettors involved in illegal gambling activities.

104. On or about June 25, 2012, the NYPD lawfully intercepted and monitored telephone calls between Branca and Brandt England. In the first call, Branca said to England, in sum and substance, "I'm trying to get out of the house and will be by your house at 11:45 a.m. [PST] to pick up chips." England then told Branca, in sum and substance, that he will pay "Joe," referring to Joseph Paulk, $31,000 in casino chips and $19,000 in cash. In the second call, Branca and England reviewed gambling figures. Branca stated, in sum and substance, that he was going to pick up $140,000 from Baxter. Later that day, law enforcement agents observed Branca meet Baxter at the Bellagio and Baxter gave Branca a sum of money. Thereafter, law enforcement agents observed Branca arrive at the Aria Resort and Casino in Las Vegas, Nevada, where he met with Joseph Paulk and gave Paulk a package.

105. Based, *inter alia*, on the above, on or about October 23, 2012, a magistrate judge in the United States District Court for the District of Nevada issued a warrant authorizing the search of, among other places, Jerald Branca's residence, located 5415 W. Harmon Avenue, Unit 1170, Las Vegas, Nevada.

106. On or about October 24, 2012, law enforcement agents lawfully searched Branca's residence pursuant to the warrant and recovered, among other things, a total of approximately $266,329.00 in United States currency (Branca $266,329); casino gambling chips valued at approximately $186,000.00 in United States currency (Branca $186,000); and money orders valued at approximately $17,300.00 in United States currency (Branca $17,300). During

the search of Branca's residence, law enforcement agents also recovered, among other items, records related to sport betting and a money counter.

### FIRST CLAIM FOR RELIEF
**(18 U.S.C. § 981(a)(1)(A))**

107.    Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

108.    The Defendant Assets were involved in transactions and/or attempted transactions in violation of 18 U.S.C. §§ 1956 and 1957.

109.    As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### SECOND CLAIM FOR RELIEF
**(18 U.S.C. § 981(a)(1)(C))**

110.    Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

111.    The Defendant Assets constitute proceeds or are derived from proceeds of property traceable to violations of 18 U.S.C. §§ 1084, 1952, and 1955.

112.     As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### THIRD CLAIM FOR RELIEF
**(18 U.S.C. § 1955(d))**

113.    Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein.

114.    The Defendant Assets were used in violation of 18 U.S.C. § 1955.

115.    As a result of the foregoing, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 1955(d).

WHEREFORE, plaintiff, United States of America, requests that the Warrant for Arrest of Articles *In Rem* issued by this Court be maintained in effect; that due notice of these proceedings be given to all interested persons; that after further proceedings, the Defendant Assets be forfeited and condemned to the use and benefit of the United States of America; and that plaintiff be awarded its costs and disbursements in this action and such other and further relief as this Court deems just and proper.

Dated: Brooklyn, New York
      August 26, 2013

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
*Attorney for Plaintiff*
271 Cadman Plaza East
Brooklyn, New York 11201

By:   <u>/s/ electronically signed</u>
      Ameet B. Kabrawala
      Assistant U.S. Attorney
      (718) 254-6001

## VERIFICATION

ANGELA JETT, being duly sworn, deposes and states as follows:

1.     I am Special Agent with the Federal Bureau of Investigation ("FBI") and am currently assigned to the Forfeiture Asset Seizure Team in New York.

2.     I have read the Amended Verified Complaint *In Rem* in this action.

3.     The matters contained in the Amended Verified Complaint *In Rem* are true and accurate to the best of my knowledge, information, and belief.

4.     The source of my information and the grounds for my belief are my personal knowledge, information provided by other law enforcement officers involved in the investigation, and my review of records lawfully obtained by state and federal law enforcement authorities.

5.     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Brooklyn, New York
   August 26, 2013

                 ANGELA JETT
                 Special Agent
                 Federal Bureau of Investigation